Michael Patrick **DORAN**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 24502.

United States Court of Appeals,
Ninth Circuit.

Feb. 3, 1970.

Peter J. Hughes (argued), of Sheela, Lightner, Hughes, Hilmen & Castro, San Diego, Cal., for appellant.

Joseph A. Milchen (argued), Asst. U. S. Atty., Harry D. Steward, U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and CARTER, Circuit Judges, and BYRNE,* District Judge.

---

* Honorable William M. Byrne, United States Senior District Judge, Central District of California, sitting by designation.

BYRNE, District Judge.

Appellant was convicted of bank robbery (18 U.S.C. § 2113(a)). Prior to trial, he made a motion to suppress evidence of incriminating statements and a mask, gun, and the stolen money, the location of which he had divulged to agents of the Federal Bureau of Investigation.

The sole specification of error is whether the trial court erred in denying the motion to suppress.

Following the hearing on the motion to suppress, the court made and filed its findings of fact, which are not disputed. Insofar as relevant to this appeal, the findings are set forth below.

On July 24, 1968, at approximately 2:25 p. m. John A. Keefe and Byron M. Taylor, Special Agents for the Naval Investigative Services Office, Office of Naval Intelligence, both civilians, were advised that there had been a bank robbery at Camp Pendleton. They proceeded to the area of the bank that had been robbed, arriving there at approximately 3:20 p. m. At that time they contacted Jim Scanlon, Special Agent of the Federal Bureau of Investigation, which investigative agency had taken jurisdiction in the matter.

Scanlon directed Taylor and Keefe to check out an incident where a gunnery sergeant had reported suspicious activity by someone at approximately the time of the robbery. Scanlon also provided a description of the robber to Keefe and Taylor, indicating that the bank robber was a male, thin build, about five feet eight inches tall, wearing a Marine utility uniform.

Taylor proceeded to interview one Gunnery Sergeant Cooper. Cooper advised Taylor that a young Marine, male, white, five feet eight inches tall, one-hundred forty pounds, with dark, wavy hair, dark brown pants, and beige sweater, was nervous and frightened in Cooper's presence when the young Marine sought to use the telephone in the Enlisted Men's Club (approximately 150 yards from the bank that was robbed).

Taylor also interviewed one David Howard Blue in the same area who related a similar description of an individual who had used the phone at about that time. Two other individuals related that the individual who used the phone was nervous.

Scanlon directed Taylor and Keefe to cruise the area to see if they could find anyone meeting the general description of the robber. Taylor and Keefe proceeded to cruise the area, also looking for discarded military clothing, assuming that the bank robber might have changed clothes.

At approximately 3:45 p. m. Taylor and Keefe observed defendant walking east on Basilone Road, approximately 100 yards west of the bank that had been robbed. Taylor identified himself and Keefe to defendant as Special Agents for Naval Intelligence. Taylor further advised defendant that there had been a bank robbery in the area and that he (defendant) met the general physical description of the person, and that Taylor and Keefe would like to talk to him. Taylor asked defendant if he was in the military. Defendant identified himself by producing his service identification card. Taylor asked defendant to which command he was assigned, and defendant indicated assignment to a regiment approximately 10 miles and twenty minutes drive from the area where the conversation was taking place. Defendant was visibly nervous at that time, and indicated that his car had broken down, and that he was expecting his girl friend to pick him up.

Taylor then asked defendant to accompany him and Keefe to the Enlisted Men's Club and to talk with the Federal Bureau of Investigation. Defendant indicated that he did not mind accompanying them. Defendant was frisked for weapons, and entered Taylor's vehicle and located himself in the back seat with Keefe.

Taylor drove to the Enlisted Men's Club, and Cooper identified defendant as the individual about whom Taylor and Cooper had had the previous conversa-

tion. Taylor and Keefe returned with defendant to the bank.

Taylor exited the vehicle and went into the bank to contact Scanlon about defendant. Taylor advised Scanlon that defendant matched the vague description of the bank robber, that defendant was coy and furtive. While Taylor was in the bank, defendant remained in the back seat of the vehicle with Keefe. Keefe took statistical information from defendant so that Keefe could write it down. The information related to defendant's name, rank, service number, and command. Keefe asked no questions of defendant regarding the bank. Defendant repeated his explanation of his presence in the area. As defendant was quite talkative, Keefe exited the vehicle for the purpose of avoiding further conversation with defendant. Further conversation might have led to an area of discussion which might have caused Keefe to advise defendant of his constitutional rights, and Keefe wanted to leave that matter to the Federal Bureau of Investigation.

Scanlon directed Terry Lee Knowles and John Jones, Special Agents of the Federal Bureau of Investigation, to interview the individual who had accompanied Taylor and Keefe to the bank area. Knowles first saw defendant between 4:00 p. m. and 4:19 p. m. Knowles was not aware of the information that was brought to Scanlon's attention, but did know that defendant did match the general description of the bank robber. No other member of the Federal Bureau of Investigation had interviewed defendant prior to the time that Knowles and Jones came into contact with him.

Knowles identified himself to defendant at Taylor's vehicle. Knowles indicated that he was a Special Agent of the Federal Bureau of Investigation, displayed his credentials to defendant and requested to interview him. Defendant stated that he would be glad to speak to Knowles and Jones and accompanied them to Knowles' vehicle, which was a convenient place to sit and take notes. The interview commenced at 4:19 p. m.

Knowles indicated to defendant that there had been a bank robbery that day, that they were investigating it, that defendant met the general description of the bank robber, and that the purpose of the interview was to establish defendant's identity and the nature of his activities during the course of the day. Knowles was unaware of any information that defendant had related to Taylor and Keefe, and knew nothing of defendant's activities on that day. Defendant was advised also that he was not under arrest at that time. Defendant indicated that he understood that he was not under arrest, and that he was willing to continue with the interview.

Knowles determined that defendant was a Marine, and was assigned to an area some distance from the one in which defendant was discovered. Defendant explained his presence in the area as being on special liberty and attempting to contact his fiancee. Defendant also indicated that he had no other clothing on his person or in his possession. This interview terminated at 4:42 p. m., when defendant requested to leave the vehicle and make a telephone call to his fiancee.

Defendant left Knowles' vehicle and went alone toward public phone located nearby. Defendant did not return to Knowles' vehicle until 5:09 p. m. In the meantime, Knowles checked out the information related to him by defendant with that related by defendant to Taylor and Keefe. Knowles determined that there was a critical discrepancy relating to clothing possessed by defendant. Defendant had told Knowles he had no other clothing than what he was wearing, but the gunnery sergeant had told Taylor that defendant had a sweater when the gunnery sergeant had observed defendant. Knowles was also not satisfied with defendant's explanation of his presence in the area.

At 5:09 p. m. Knowles again commenced to interview defendant. Prior to asking him questions on this occasion, Knowles advised defendant of his constitutional rights in compliance with *Mi-*

*randa,* and defendant executed a form acknowledging notice of his constitutional rights, and expressing a desire to waive them and proceed with the interview.

Knowles then inquired again of defendant as to his activities during the day, this time in more detail. The subject of the sweater was discussed.

At approximately 6:01 p. m. Knowles asked defendant if defendant had robbed the bank. Defendant answered, "Yes, I did, and I'd like to get it over with." Prior to this question and answer, defendant had not requested an attorney, had not expressed a desire that the interview terminate, and had not expressed a desire to remain silent.

Due to the discrepancy relating to defendant's clothing which discrepancy appeared when Knowles discussed the matter with Taylor and Keefe between 4:42 and 5:09 p. m., Taylor and Keefe were going to recontact the parties at the Enlisted Men's Club to pin down the statements regarding defendant's clothing. The results of that investigation were not known when defendant confessed.

At 6:04 defendant again admitted that he robbed the bank to Dave McCluggage, Special Agent of the Federal Bureau of Investigation. This statement was not in response to any question put to defendant by any agent of the Federal Bureau of Investigation, but did follow Knowles' relation to McCluggage that defendant had admitted the bank robbery. Defendant then produced a mask from his person, and led Knowles to where the money and gun were located, which money and gun were involved in the bank robbery.

Upon these findings, the absence of any circumstances suggesting harassment, the nature of the constitutional rights given to defendant, his waiving of his constitutional rights, and the apparent voluntariness of his confession, the district court judge concluded that the statement of the defendant admitting his participation in the bank robbery was admissible as the result of a limited on-the-scene detention and inquiry. We agree.

Appellant relies primarily upon Morales v. New York, 396 U.S. 103, 90 S.Ct. 291, 24 L.Ed.2d 299, decided December 8, 1969. In the New York Court of Appeals, Morales, for the first time, raised a Fourth Amendment issue, claiming that there was no probable cause for his detention at the time of his confession and that the confessions, even if voluntary, were inadmissible fruits of the illegal detention. The Supreme Court remanded the case for an evidentiary hearing so that the record would permit a satisfactory evaluation of the facts surrounding the apprehension and detention of Morales.

The *Morales* case may be distinguished in a number of particulars. Morales was apprehended by police officers and taken to the police station where he was interrogated. He was not free to leave after he was apprehended.

Doran was stopped by two Special Agents for Naval Intelligence. They did not question him about the bank robbery but merely asked questions relating to his military service. When they asked him to accompany them to the Enlisted Men's Club and to talk with the agents of the Federal Bureau of Investigation, he indicated that he did not mind accompanying them. He was not detained against his will. Actually, he had no desire to leave. He explained his presence in the area by stating his car had broken down and that he was expecting his girl friend to pick him up at that location. When F.B.I. Agent Knowles interviewed Doran in his car, he told him he was not under arrest and was free to leave the vehicle at any time. In response Doran said he understood he was not under arrest and that he was willing to continue with the interview.

While sitting in F.B.I. Agent Knowles' car conversing with Knowles, Doran requested to leave the vehicle for the purpose of making a telephone call to his fiancee. He voluntarily returned to the car after an absence of almost

thirty minutes. During Doran's absence, Knowles had obtained additional information, and upon Doran's return, Knowles again informed him he was not under arrest and advised him of his constitutional rights in compliance with *Miranda.* After Doran signed a written waiver of rights and agreed to proceed with the interview, Knowles interrogated him in detail about the robbery. Doran then confessed to robbing the bank and later gave a mask to another F.B.I. agent and led him to the location where his gun, and the money which was taken from the bank, were buried.

In Miranda v. Arizona, 384 U.S. 436, 477, 478, 86 S.Ct. 1602, 1629, 16 L.Ed. 2d 694, the court stated: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. * * * *General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." (emphasis supplied)

In remanding the *Morales* case, the Supreme Court said: "Given an opportunity to develop in an evidentiary hearing the circumstances leading to the detention of Morales and his confessions, the State may be able to show * * * that Morales' *confrontation with the police was voluntarily undertaken by him or that the confessions were not the product of illegal detention.*" (emphasis supplied)

In the instant case there is no need of a remand since there was a full hearing on the motion to suppress and the testimony given at that time was by stipulation, incorporated in the trial on the merits. Not only was the detention a legal "on-the-scene" detention and inquiry, but the detention and inquiry were in all respects voluntary. Doran was informed on two occasions that he was not under arrest and was free to leave and when, in response to the inquiry as to whether he had robbed the bank, he replied, "Yes, I did, and I'd like to get it over with," he not only had stated he understood his constitutional rights, but that he understood he had the privilege of leaving the scene of the interrogation.

Affirmed.