**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas J. BRUNSON,
Defendant-Appellant.**

No. 75–4390.

United States Court of Appeals,
Fifth Circuit.

March 24, 1977.

Rehearing and Rehearing En Banc
Denied April 28, 1977.

James E. Taylor, Jr., Edward A. Nagel (Court-appointed), Orlando, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before MORGAN and GEE, Circuit Judges, and HUNTER,* District Judge.

* Senior District Judge of the Western District of Louisiana, sitting by designation.

1. The indictment cited 18 U.S.C. §§ 2114, 1114, 1111, and 2:

§ 2114: Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

§ 1114: Whoever kills . . . any officer or employee of the Postal Service . . . while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under sections 1111 and 1112 of this title.

§ 1111:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment,' in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

LEWIS R. MORGAN, Circuit Judge:

Thomas J. Brunson appeals convictions for his part in the armed robbery of the Gotha, Florida post office and the murder of its postmistress.[1] He argues that the district court erred by (1) refusing to suppress a statement and fingerprints taken from him by postal inspectors; (2) admitting evidence of his participation in another

§ 2:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

In a recent opinion on an interlocutory appeal by the government against another person charged in this same robbery and killing under the same four statutes, another panel of this court noted that the defendant there had been charged with the killing under § 1114 and the robbery under § 2114. In a footnote the court added:

The indictment also cited . . . 18 U.S.C. § 1111, which proscribes murder '[w]ithin the special maritime and territorial jurisdiction of the United States.' We express no opinion whether 18 U.S.C. § 1111 extends to a post office murder. The § 1111 penalty range is the same as the § 1114 range, and there appears to be no obstacle to proving that the victim was a postal employee. Accordingly, the indictment's reference to § 1111 is inconsequential.

*United States v. Herman*, 544 F.2d 791, 793 n. 2 (5th Cir. 1977). We agree that in this case the indictment's reference to § 1111 is "inconsequential," rendering it unnecessary to decide whether § 1111 covers post office murders, but we feel some further explanation is necessary.

The reasons why the reference to § 1111 is inconsequential are that the "penalty range" for violation of it and of § 1114 is the same, and that there is no question in this case that the victim was a postal employee engaged in the discharge of her official duties (§ 1114). But the reason that the "penalty range" is the same under both statutes is that § 1114 incorporates the penalties of § 1111 by reference; § 1114 does not state a "penalty range" of its own, but rather states that a violator of the section "shall be punished as provided under sections 1111 and 1112 [manslaughter] of this title."

The *Herman* panel's conclusion necessarily encompasses a conclusion that § 1114's reference to § 1111 incorporates only § 1111's penalty range, and not its jurisdictional basis, i. e., murder "within the special maritime and territorial jurisdiction of the United States." Otherwise the *Herman* panel would have found it necessary to decide whether a post office falls within this jurisdiction before it could state that indictment under § 1114 was proper. We

armed robbery committed four days before the post office robbery; and (3) refusing to direct a verdict of acquittal. We affirm.

## I. FACTS.

A little before 3:30 p. m. on July 21, 1975 Marion Bush, a resident of the small rural community of Gotha, was watching television at home when she heard a loud noise from the vicinity of the nearby post office. She looked out her window and saw two black men emerge from the post office and drive off in a light colored Cadillac. She rushed to the post office and found that the postmistress, Marion Loraine Smith, had been shot to death.

Bush telephoned the Orange County sheriff's office, which sent deputies to secure the post office. United States postal inspectors and sheriff's deputies immediately began an intensive investigation. Although no one had witnessed the killing, a number of Gotha residents reported seeing a car and men matching those described by Bush driving around Gotha on the day of the

killing. Two people had seen one black man inside the post office and the Cadillac outside the post office minutes before the murder, but no one remembered the men's faces. A fingerprint expert lifted latent prints from the post office, and an audit revealed that $288.70 in cash was missing.

The first break in the case came at about 7:00 p. m. on July 30, when fingerprints lifted from the post office counter were found to match known prints of a Glen Herman. Investigators already had determined that a Glen Herman recently had bought a Cadillac similar to the one seen in Gotha on the 21st, and they now launched a concerted effort to find Herman, the Cadillac, and anyone who knew Herman.

During this effort the investigators came to believe that one of Herman's associates was an Aaron Brunson, whom the investigators believed also was called "Black Boy."[2] Aaron Brunson was thought to live at a particular address in a poor neighborhood of Winter Garden, Florida, which is a few miles northwest of Gotha. At about

---

agree with this conclusion, for otherwise § 1114 would be limited not merely to murders of federal employees in the discharge of their official duties, but to murders of such employees *only when they are within the special maritime and territorial jurisdiction of the United States.* Such a reading would mean that § 1114 would not cover, for instance, murders of mail carriers when they are on their routes, for as the discussion below makes clear, they are not "within the special maritime and territorial jurisdiction of the United States" at such times. Such a reading, however, would be at odds with the long-established understanding of § 1114. *E. g., United States v. Rivera,* 513 F.2d 519, 521 n. 1 (2d Cir.), *cert. denied,* 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975). It is for this reason that we agree with the *Herman* panel's implicit conclusion that § 1114 incorporates only the penalty, and not the jurisdictional, provisions of § 1111.

While this conclusion makes it unnecessary to decide whether a post office is within the "special maritime and territorial jurisdiction of the United States," we note that that term is defined for purposes of Title 18 in 18 U.S.C. § 7. In the portion of § 7 that is relevant here, it is provided:

The term 'special maritime and territorial jurisdiction of the United States' . . . includes:

. . . . .

(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

*See United States v. Erdos,* 474 F.2d 157, 159–60 (4th Cir.), *cert. denied,* 414 U.S. 876, 96 S.Ct. 42, 38 L.Ed.2d 122 (1973); *cf. Battle v. United States,* 209 U.S. 36, 37, 28 S.Ct. 422, 423, 52 L.Ed. 670 (1908) (holding that federal statute proscribing murder "within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States" encompasses murder on land bought by United States on which post office was under construction; states that under U.S.Const. art. I, § 8, cl. 17, "Post offices are among the 'other needful buildings' for the erection of which, as well as 'forts, magazines, arsenals, dockyards,' it is assumed that land will be bought, and for which land has been bought by the Government all over the United States.").

**2.** The record before us does not reveal the source of this information.

9:30 p. m. on the 30th four postal inspectors and a sheriff's deputy left the operational headquarters for the case, the 33rd Street Annex of the Orange County Sheriff's Department, and drove in two cars to the neighborhood where they believed Aaron Brunson lived. Their purpose, the investigators later testified, was to locate Aaron "Black Boy" Brunson for an interview as to Herman's whereabouts, to look for another, unnamed associate of Herman, and to keep an eye out for Herman's Cadillac. Record Vol. II at 206–07, 210, 241, 245–56, 253, 255–56, 271–72, 279, 294, 303–04. Five investigators went because of the possibility they might run across Herman himself, *id.* at 245, 364–65, and because the neighborhood was known to be a rough one, *id.* at 268–70, 277–78, 304, 366.

What transpired next formed the crux of the suppression issue and was explored in great detail at the pre-trial suppression hearing. Four of the five investigators who went to Winter Garden that night testified. They agreed that Postal Inspector Bowers and Deputy Mack, dressed in civilian clothes and driving an unmarked car, parked in front of the house where they thought Aaron Brunson lived. Bowers and Mack knocked on the front door, identified themselves to the person who answered, and said they would like to see "Black Boy" Brunson. The person who answered shouted up to the second floor of the house to "Black Boy." A man appeared on the second story porch and asked who wanted to see him. Mack shouted up that he was from the sheriff's office.

"Black Boy" came down the back stairs of the house and up a side alley to the front, where Bowers and Mack again identified themselves. They told "Black Boy" they would like to talk to him, and the three walked to Mack and Bowers' car. There they were joined by Postal Inspectors Broadwater, Post, and Miller, also in plain clothes, who had been waiting near the side or back of the house.

The investigators told Brunson that they would like to talk to him at their headquarters. Inspector Broadwater testified that he told Brunson, "I want you to do it voluntarily. You are not under arrest," and that Brunson replied, "Certainly." Record Vol. II at 238. The investigators also told Brunson that they would bring him home after his interview. *Id.* at 273–74. They asked whether Brunson would like to tell his family where he was going, and Deputy Mack told the family where Brunson was going and that the investigators would bring him home after his interview. *Id.* at 223, 273. The investigators described Brunson's attitude toward going with them as "most cooperative," *id.* at 224 (Inspector Bowers), "very cooperative," *id.* at 239 (Inspector Broadwater), 267 (Deputy Mack), and "completely cooperative," *id.* at 291 (Inspector Post).

The investigators also were unanimous in testifying that none of them told Brunson he was under arrest or so much as touched him, let alone frisked, searched, or handcuffed him. *Id.* at 223, 225, 238–39, 267–68, 273, 290–91, 292. Although the investigators were armed, their weapons were not visible. *Id.* at 248–49, 267, 291, 301. They made it clear at the hearing that they had no intent to arrest or detain Brunson, because at that time they knew no more than that Aaron or "Black Boy" Brunson knew Herman. *Id.* at 239, 242, 292.[3] They also explained that they preferred to conduct the interview at their headquarters because a crowd was milling around the house, *id.* at 229, 236–38, because the house itself appeared to be crowded, *id.* at 229, and because they had pictures of Herman at headquarters, *id.* at 237. They stated that they would have interviewed Brunson at home if

---

**3.** The investigators stated that, since they knew two men had been seen leaving the post office after the shooting and thought one of them was Glen Herman, some degree of suspicion would attach to anyone associated with Herman. Record Vol. II at 213, 245, 366, 381. It appears that no special degree of suspicion was attached to Aaron "Black Boy" Brunson before the investigators went to Winter Garden, though; before they went, known fingerprints of Aaron Brunson had been found not to match any latent prints lifted at the post office. *Id.* at 207.

he had asked them to, *id.* at 300, and that if Brunson had asked to be let out of the car or taken home during the ride to headquarters, they would have complied, *id.* at 239, 293. During the investigation at least one other person had been interviewed at the operational headquarters rather than at his home or place of business. *Id.* at 215.

Brunson rode to the 33rd Street Annex with Broadwater, Post and Miller. On the way there Broadwater asked Brunson if his first name was Aaron and learned, for the first time, that "Black Boy" Brunson was not Aaron Brunson, but rather his brother Thomas Brunson. *Id.* at 240–41. Broadwater also made some "small talk," asking what Brunson did for a living and learning that he picked oranges, *id.* at 240, but no other questioning took place on the ride to the Annex.

At about 10:15 p. m. they arrived at the Annex and Brunson was shown into the office where the interview was to take place. Detective Nazarchuk and Postal Inspector Weaver came in and introduced themselves to Brunson. They told him they were investigating the Gotha murder and read him the *Miranda* rights, which Brunson said he understood.[4] Brunson signed a card waiving his right to have an attorney present during the interview. *Id.* at 312–14.

After some preliminary confusion the officers determined that Brunson did know Glen Herman, but only by the name "Willie." Nazarchuk began questioning Brunson about his association with Herman. Brunson said that he had ridden with Herman in Herman's Cadillac on occasion. When Nazarchuk asked whether Brunson had ridden with Herman on July 21st, Brunson first gave inconsistent accounts of his activities that day. Under further questioning he said he wanted to tell the investigators the truth. *Id.* at 316, 334–35. They took a short break, *id.* at 318, 360–61, and Brunson then told the investigators that he had been with Herman inside the Gotha post office when Smith was killed, but that Herman was the one who killed her and that he, Brunson, had not known beforehand that Herman was going to rob the post office or kill the postmistress.[5]

After exploring the details of Brunson's story, the investigators asked whether he would allow them to tape record his version. He agreed, and at 12:20 a. m. the investigators started the recording machine, read Brunson his *Miranda* rights again, and again elicited the details from him.[6] The

---

**4.** Nazarchuk testified that they gave *Miranda* warnings at this time from an abundance of caution, and not because their investigation had focused on Brunson. Record Vol. II at 336.

**5.** Weaver testified that Brunson would have been free to leave up to the time his involvement in the robbery and murder became known. Record Vol. II at 371.

**6.** In pertinent part, Brunson's statement was as follows, Government Exhibit No. 29:

A. I was on Center Street at Brown's Bar in the front standing up under some trees. That's when Willie drove up and tell me, he asked me did I want to ride. And I answered him yes. We left 9th St. on . . . we left 9th St. on 50, turned off 50 on the Old Winter Garden Rd., turned off the Old Winter Garden Rd. on a black top road leading down to Gotha. We passed the post office. We went around passed a store below the post office, turned around, came back, turned left just a little before you get to the post office, went on to a little dead end like, turned around and came back, and

turned into the dirt road above the post office. We parked there for awhile. Two little boys was coming up and as they was walking they walked in front of the. car. One of them had a model airplane. After they passed, he drove the car passed the post office again on the black top road. Then as we was going there we passed two girls coming out from, like look, well it was some houses, but it was in, like in the woods. Okay. He passed those, then he turned around and come back, went down there below the post office, parked them he set awhile. I got out and went into the post office. As I went in there, there was an old man walking out the door. I spoke to him and he spoke back. As I was standing to the counter talking to the clerk, the lady at the post office, a middle aged woman came in. She was at the mail box. I turned around and looked at her, then I turned around and looked back. I was talking to the lady, then she left from where I was to one, one booth and went around to another one as I was

officers then formally arrested Brunson for first degree murder and robbery of the post office and took his fingerprints. These prints later proved to match previously unidentified latent prints lifted from the counter of the Gotha post office. The investigators testified that at no time did either of them make any threats or promises to Brunson, *id.* at 311, 361–62, 368, and that he seemed willing to relate his story, *id.* at 314, 315, 321–22, 356.

Brunson himself also testified at the suppression hearing. His testimony, in the main, substantiated that of the investigating officers. Although he said he had

thought he was under arrest at his home and that he did not know he did not have to go to the Annex with the officers, Record Vol. I at 164, Brunson admitted that they did not tell him he was under arrest, *id.* at 175, or frisk him, *id.* at 174–75, or handcuff him, *id.* at 175, or show weapons to him, *id.* at 174, 176, and that upon their request he had agreed to go with them, *id.* at 176. He also remembered telling Nazarchuk and Weaver that he understood the rights they had read him, *id.* at 183, although he claimed that he thought he could not have an attorney unless he paid for one, *id.* at 168.

sitting there talking to her. Whether Willie was already in there or where he was, I didn't see him. The next thing I know he was jumping up, he was up on the counter. When I looked again he was behind the counter. That's when I stand up. He shot her. When I looked he shot her. She fell. I didn't know where he shot her at, but I went to go look and see. As I started across, he stopped me. We left out the post office, got into the car, drove off, making a right turn, coming to Winter Garden. Before we made it to Winter Garden, we turned around at a dirt road on the left hand side. I thought he was going back to see was she dead or hurt or where she was hurt at. As he went back, he passed the post office, making a right turn, passing between two orange groves on both side of the road. He then drove down, but he went to the dirt road there, to the end of the road the last time. He turned around, come back, parked. I thought he was going back in there to see was she hurt. That's when I went to get out, he tell me to stay in, so I stayed in. What he went in there and did or got I don't know. How much money he got there, I don't know that either. But when he come back and got in the car, I asked him, these are my questions. I said is she dead. He said no, she was moving. I said to myself well she isn't dead then. As he put me out the car, I tell him, I said I want none of the money, I don't want none of it, you can have all of it to do what you want to. That's when I left and went upstairs. I knew they was gonna find me, so I didn't even try to run. I sat there and wait on them. I knew you was coming. And I said to myself when they come, if I can't get out, I'm gonna tell the truth. And that's the truth of the whole truth.

Q. Okay. When you went into the post . . . what, why did you go into the post office?

A. He tell me to go in there and buy some stamps and see how many people was in there. And I went back and I tell him. I said there's a man and old lady in there. But I didn't went all the way in there at first. Then he said go back in, tell me when the old man leave out. I went in there. That's when I spoke to the old man, right. He just said it was hot and I said yeah, hello, you know. I passed him, then I went in there. I was talking to the lady. She left from one counter and went to another one. That's when the middle aged lady came in and I looked around at her. Then I left and went on the other side where the lady that worked in the post office was. I was talking.

Q. Okay, after the gun went off, you said you were going to go over the counter?

A. I started over the counter.

Q. Okay, why were you going to go over the counter?

A. Well, first of all, if he would have robbed her and if he would have killed her, I'd have been *just as much at fault as he is.* So if the gun went off, I said to myself, if . . . she could have fainted, you know, and he could have shot somewhere else. He didn't have to shoot her because the gun went off, right. As I start over the counter, that's when he tell me no I got . . . he told me to get back. That's when I got back on over there. Okay, I left from back there with her, the lady and him, I left them back there. I went in the, the other side where the mailbox was at. That's where I was standing at.

After hearing all this evidence the district court in a written order denied Brunson's motion to suppress the tape-recorded statement and fingerprints taken on the night of the 30th. At trial the government relied primarily on the fingerprint evidence, a transcript of Brunson's statement, and evidence that four days before the Gotha murder Brunson and Herman had committed an armed robbery of a Magik Market in Winter Garden, which evidence is rehearsed in Part III *infra*. Brunson testified in his own behalf at trial, admitting the substance of his statement to investigators but again denying that he had any foreknowledge that Herman was going to rob the post office or kill Smith. The defense also attempted to establish an alibi for the night of the 17th, when the Magik Market was robbed. After hearing all the evidence the jury, which was sequestered throughout the trial, found Brunson guilty on both the murder and the armed robbery counts. The court sentenced him to consecutive prison terms of life and twenty-five years, and Brunson brings this appeal.

## II. MOTION TO SUPPRESS.

In support of his contention that the district court should have granted his motion to suppress, Brunson argues that his initial encounter with investigators and his journey with them to the 33rd Street Annex constituted an arrest without probable cause, illegal under the Fourth Amendment,[7] and that the illegal arrest "tainted" the subsequent taking of his statement and fingerprints.[8] *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The government, conceding that the investigators did not have probable cause to arrest Brunson, argues that he was not arrested at all, but rather voluntarily accompanied investigators to the 33rd Street Annex for the interview; and that in any event, the giving of *Miranda* warnings before questioning helped to purge any taint that might have occurred. As we read its order denying Brunson's motion to suppress, the district court found that Brunson "accompanied the officers voluntarily and not on account of coercion either physical or psychological;" hence, it thought that no arrest at all had been made, let alone an illegal one. Record Vol. I at 411.[9] Although Brunson attacks this finding as "purely erroneous," Brief for Appellant at 17, 22,[10] we uphold it.[11]

7. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

8. Brunson makes no contention here that the *Miranda* warnings were not timely given or that his statement was "involuntary" in the Fifth Amendment sense.

9. Because the district court had before it the closely related questions whether Brunson was "seized" in the Fourth Amendment sense when he went with investigators to the Annex, and whether he was taken into "custody" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) at that time, that court's order at times discusses the two questions as if they were one. Specifically, it appears that the court, in addition to applying its "voluntariness" test, looked to this court's suggested four-prong inquiry for deciding whether "custodial" interrogation triggering the requirement of *Miranda* warnings, oc-

curred in determining whether Brunson was "seized" in the Fourth Amendment sense. *See United States v. Carollo*, 507 F.2d 50, 52 (5th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975). Both parties before us treat *Miranda* "custody" and Fourth Amendment "seizure" as if they were synonymous. Although we are not sure whether every Fourth Amendment "seizure," no matter how brief or for what purpose, necessarily results in *Miranda* "custody," *see United States v. Montos*, 421 F.2d 215, 221–23 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970), we do think that the underlying inquiries are similar enough to justify the district court and the parties in their approach to this case. *See* notes 12 and 13 *infra*.

10. We assume he means "clearly erroneous."

11. We therefore do not reach the district court's finding that even if an illegal arrest took place, subsequent events sufficed to purge any taint. Record Vol. I at 413–15.

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) teaches that, under the Fourth Amendment, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 17, 88 S.Ct. at 1877; *see also United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Davis v. Mississippi,* 394 U.S. 721, 724–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).[12] The detention of a person need not be accompanied by formal words of arrest or stationhouse booking in order to constitute an "arrest" requiring probable cause under the Fourth Amendment. *Davis v. Mississippi, supra,* 394 U.S. at 726–27, 89 S.Ct. 1394. Some detentions do not amount to "arrests" requiring probable cause, but rather constitute less-than-arrest "seizures" subject to a less-than-probable-cause requirement for justification. *See, e. g., Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Nonetheless, any "seizure" of the person that does not meet the Fourth Amendment standard of reasonableness may taint a subsequent statement or search. *See, e. g., United States v. Robinson,* 535 F.2d 881 (5th Cir. 1976); *United States v. Rias,* 524 F.2d 118 (5th Cir. 1975).

At the same time, courts have been careful to distinguish encounters with police undertaken by a person voluntarily from Fourth Amendment "arrests" or less-than-arrest "seizures." Thus, in *Davis v. Mississippi, supra,* where it held that an "investigatory detention" without probable cause violated the Fourth Amendment, the Supreme Court took pains to point out that the "State makes no claim that petitioner

voluntarily accompanied the police officers to headquarters . . . ." 394 U.S. at 726, 89 S.Ct. at 1397. Similarly, in *Morales v. New York,* 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), where petitioner claimed that his stationhouse confession was tainted by an illegal seizure of his person, the Court remanded for an evidentiary hearing, on inter alia, the question whether petitioner's "confrontation with the police was voluntarily undertaken by him . . . ." *Id.* at 105, 90 S.Ct. at 293. Again, in *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) the Court noted that even though respondent "telephoned the Portland police and voluntarily came into Portland for questioning," *id.* at 292, 93 S.Ct. at 2002, the police refusal to let him leave when he wanted to marked the beginning of a "detention of the respondent against his will [and] constituted a seizure of his person," *id.* at 294, 93 S.Ct. at 2003. *See also Adams v. Williams,* 407 U.S. 143, 146 & n.1, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Johnson,* 147 U.S. App.D.C. 31, 452 F.2d 1363, 1371–72 & n.36 (1971), *appeal after remand,* 158 U.S.App. D.C. 299, 485 F.2d 1078 (1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1426, 39 L.Ed.2d 478 (1974); *United States v. Bailey,* 447 F.2d 735, 737 (5th Cir. 1971); *United States v. Holland,* 438 F.2d 887, 888–89 (6th Cir. 1971); *Doran v. United States,* 421 F.2d 865, 868–69 (9th Cir. 1970); *Government of Virgin Islands v. Kirnon,* 377 F.Supp. 601, 698–99 (D.V.I.1974). As the cases cited above make plain, a person is not arrested or seized under the Fourth Amendment if he is free to choose whether to enter or continue an encounter with police and elects to do so.[13]

---

12. *Miranda* teaches that, for purposes of triggering the warning requirement, "custodial interrogation . . . mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612; *accord, id.* at 477, 478, 86 S.Ct. 1602. Thus, the core meaning both of "seizure" in the Fourth Amendment sense, and of "custody" in the *Miranda* sense, appears to be the same: the restraint of a person's "freedom to walk away" from the police. The four-prong *Carollo* in-

quiry itself is designed expressly to help make the underlying determination whether a " 'person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *United States v. Carollo, supra,* 507 F.2d at 52, *quoting Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. 1602.

13. The Supreme Court recently has made seemingly the same point with respect to encounters with law enforcement agents undertaken voluntarily in interpreting the meaning of "custody" under *Miranda.* In *Beckwith v.*

Turning to the facts in this case, we find the district court did not err in holding that Brunson was not seized when he accompanied investigators to the 33rd Street Annex. The evidence supports the view that the investigators had not focused on "Black Boy" as a suspect, let alone obtained information sufficient to support probable cause as to him, when they went to talk to him. The investigators testified, and we see no reason to doubt, that they simply wanted to interview anyone who might know the whereabouts of Glen Herman, upon whom the investigation *had* focused. Significantly, the investigators told Brunson that he was *not* under arrest, that they intended to drive him home after the interview, and that they wanted his decision whether to talk to them to be voluntary.[14] They certainly did not treat Brunson as if he were under detention: there was no frisk, no handcuffing, and no physical contact of any kind. They testified, and we see no reason to doubt, that they would have taken Brunson home if he had asked them to, any time before he implicated himself. In short, from all that appears, the investigators were careful *not* to restrain Brunson's "freedom to walk away."

Even if we were to credit Brunson's testimony that he *thought* he was being arrested, our conclusion would be the same. Brunson knew what the investigators did not, that he had been present at the robbery and killing. His statement at the Annex, note 6 *supra*, suggests that he had been expecting police to come for him and simply had waited for them; hence, it would not be surprising if he did think the investigators had come to arrest him. But they did not come for that purpose, and they told him so. Under these circumstances, Brunson's own expectations cannot convert an otherwise innocent request to talk to investigators into a Fourth Amendment "seizure." *See United States v. Scheiblauer*, 472 F.2d 297, 301 (9th Cir. 1973); *United States v. Kershner*, 432 F.2d 1066, 1070 (5th Cir. 1970); *United States v. Cortez*, 425 F.2d 453, 457 (6th Cir.), *cert. denied*, 400 U.S. 906, 91 S.Ct. 147, 27 L.Ed.2d 143 (1970); *Coates v. United States*, 134 U.S.App.D.C. 97, 413 F.2d 371, 373–74 (1969); *Hicks v. United States*, 127 U.S.App.D.C. 209, 382 F.2d 158, 161 (1967). We hold that the district court did not err in finding that Brunson decided to accompany the investigators without pressure on their part and in therefore refusing to suppress the statement and fingerprints.

## III. OTHER CRIME EVIDENCE.

Brunson argues that the district court erred in permitting the government, over objection, to present evidence at the end of its case in chief that four days before the Gotha robbery and murder, Brunson and Glen Herman robbed a Magik Market grocery in Winter Garden. On the government's proffer, and out of the presence of the jury, Mary Ellen Gardner testified that on the evening of July 17, 1975 she was working behind the counter of the Magik Market when two black men forced her to open the store's safe at gunpoint. The men fled with two bags of money from the safe and Gardner's purse, which contained an elk's tooth necklace, some food stamps, a small amount of cash, and other personal effects. Gardner stated that a few days

*United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) the Court held that *Miranda* did not apply to questioning of a petitioner who " 'was neither arrested nor detained against his will,' " *id.* at 344, 96 S.Ct. at 1615, 48 L.Ed.2d at 6, *quoting* 166 U.S.App.D.C. 361, 510 F.2d 741, 742 (1975), even though a tax investigation had "focused" on him at the time Internal Revenue Service agents went to his home and asked him to talk to them. *See also Miranda v. Arizona*, *supra*, 384 U.S. at 477–78, 86 S.Ct. 1602; *United States v. Presley*, 478 F.2d 163, 169 (5th Cir. 1973), *citing United States v. Prudden*, 424 F.2d 1021, 1025–31 (5th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

14. We think these facts suffice to distinguish the instant case from *United States v. Guana-Sanchez*, 484 F.2d 590 (7th Cir. 1973), *cert. dismissed*, 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361 (1975), where the Seventh Circuit agreed with a district court finding that a policeman's "invitation" to a motorist he had stopped to follow him to the police station in reality was an "order" to do so, with the result that an illegal arrest was held to have occurred.

later her wallet was found beside the road between Winter Garden and Apopka and returned to her, and that she herself found some of the purse's other contents scattered along the same road. She said that one of the men who robbed her had dropped a dollar bill, a book of matches, and a small photograph onto the counter when, before robbing her, he feigned interest in buying a cinnamon roll. Gardner was unable to describe or identify the men who committed the robbery.

Marilyn Conyers who had known both Brunson and Glen Herman for some time, testified that she had been riding with them in Herman's Cadillac on the evening of July 17, 1975. Brunson, she said, was wearing a gun in a shoulder holster. They rode around a while and Conyers fell asleep in the back seat. When she awoke, the car was parked behind the Magik Market, and Brunson and Herman were climbing back in. Herman was carrying a gun, some money, and a woman's purse. Brunson, she testified, stated that Herman had held a gun to the woman's head. The three of them drove to Apopka, and on the way Conyers looked inside the purse and saw a necklace with a tooth on it, some food stamps, a small amount of cash, and other personal effects. She threw the contents of the purse out the car window and, when they arrived at Apopka, Brunson and Herman divided up the money.

Brunson's mother identified the picture left behind by the robbers as one of her granddaughter (and Thomas Brunson's niece) from New York.

After hearing this evidence on the government's proffer, the court looked to the four-prong test for deciding admissibility of evidence of other crimes outlined in, e. g., *United States v. San Martin*, 505 F.2d 918, 921–22 (5th Cir. 1974) and *United States v. Goodwin*, 492 F.2d 1141, 1148–55 (5th Cir. 1974), and it held that the evidence was admissible for the sole purpose of showing that when Brunson entered the Gotha post office, he intended to help Herman rob it. Record Vol. V at 873–76. Then, after admonishing the jury carefully as to the limited purpose for which the evidence would be admitted, *id.* at 961–62, the court allowed the same three witnesses to present substantially the same testimony to the jury.[15]

The general rule against admitting evidence of crimes or wrongs by a defendant, other than those for which he is on trial, is intended to prevent a jury from convicting a defendant "because it believes him to be a person of bad character or because of a notion that, since he committed some other similar crime, he must also have committed the crime for which he is on trial." *United States v. Goodwin, supra,* 492 F.2d at 1148. Although there are circumstances under which the trial court properly may permit evidence of other crimes to be introduced,[16] the court first must satisfy itself that several conditions designed to protect the general rule from erosion are met:

1. Proof of the prior *similar* offenses must be 'plain, clear and convincing;'

2. The offenses must not be too remote in time to the alleged crime;

3. The element of the prior crime for which there is a recognized exception to the general rule, such as intent, must be a material issue in the instant case;

4. There must be a substantial need for the probative value of the evidence provided for by the prior crimes. [cite]. If all of these prerequisites are satisfied, and if it appears on balance that the need for such evidence outweighs the prejudi-

---

**15.** The admonition was repeated once during the witnesses' testimony. Record Vol. V at 984–85; and again during final instructions, *id.* at 1201–03.

**16.** Fed.R.Evid. 404(b) states the general rule and exceptions:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

cial effect it is likely to have, then the evidence is admissible.

*United States v. San Martin, supra*, 505 F.2d at 921–22 (emphasis in original).[17]

A. Scope of Cross-Examination on Proffer. Brunson stresses that Conyers' testimony, otherwise damning, was subject to attack on the ground of credibility; and that absent this testimony, no witness could connect him with the Magik Market robbery. He argues that during the proffer the district court unduly limited his cross-examination of Conyers as to grants of immunity she may have received. The result, he complains, is that he was unable to convince the court that the evidence of his participation in the Magik Market robbery was not "plain, clear and convincing" because Conyers was not a credible witness.

On the proffer the government represented, and Conyers testified, that she had been granted immunity from state prosecution for the Magik Market robbery. Record Vol. V at 839–41, 864–65. The government also represented that she had not been granted immunity from federal prosecution, *id.* at 839, although later, on cross-examination before the jury, Conyers testified that she had been arrested in connection with the Gotha crimes and that those charges had been dropped. *Id.* at 1013–15.[18] Brunson's specific complaint is that the district court did not permit him to pursue the topic of immunity for the Gotha crimes on cross-examination during the proffer. *See id.* at 841–42, 863–64.

■■ We think the complaint is without merit. The district court knew about the state grant of immunity when it ruled on admissibility, and it may have known about any federal grant. *See* note 18 *supra.* In any event, on the second day of the proffer the court did permit defense counsel to ask Conyers whether she was testifying because of a grant of immunity, and the court itself questioned her with regard to the truthfulness of her testimony. Record Vol. V at 863–65. The scope of cross-examination ordinarily is committed to the sound discretion of the trial court, *United States v. Killian*, 541 F.2d 1156, 1161 (5th Cir. 1976), and we cannot say that discretion was abused in this instance. Moreover, the defense was permitted to cross-examine Conyers fully on these matters during her testimony before the jury, Record Vol. V at 1009–15, so that any error on the proffer would, in our opinion, become harmless. Fed.R.Crim.Pro. 52(a).

■ B. Admission of Evidence. We also conclude that the district court did not err in admitting the evidence described above. Although Gardner could not identify the two armed black men who robbed her Conyers' testimony that it was Brunson and Herman was corroborated in a number of other details.[19] The testimony of Brunson's mother that the photograph left by one of the robbers, apparently inadvertently, was of Brunson's niece also had some corroborative value. We cannot say on this record that the district court erred in holding the evidence of Brunson's participation in the Magik Market robbery was "plain, clear and convincing."

17. Because we conclude that the other crimes evidence was admissible under such cases as *San Martin, supra*, we find it unnecessary to decide in this case whether the new Federal Rules of Evidence embody less exacting standards for admission than our own prior cases.

18. The record is not clear on the point, but it appears possible that Conyers may have been granted federal immunity for the Gotha crimes some time between the first day of her testimony on the proffer (when the government attorney made his representation) and the day she testified before the jury. *See* Record Vol. V at 863 (representation of counsel for Brunson on second day of proffer that, "She [Conyers] is immunized completely"), 1013–15 (testimony of Conyers before jury that she had been arrested but not prosecuted for the Gotha crimes). Although we have no way of knowing whether Conyers in fact did receive a formal grant of immunity from federal prosecution at some point, we note that Brunson does not contend that the government attorney's representation that federal immunity had not been granted was not true when it was made.

19. Specifically, Conyers was able to describe the contents of the purse stolen from Gardner and the place where the contents were discarded.

We also think that the two robberies—both committed by two men with a gun and in the absence of witnesses other than the victim—were sufficiently similar to support admissibility here. *See United States v. Fonseca,* 490 F.2d 464, 470–71 (5th Cir.), *pet. for rehearing granted and case remanded for resentencing.* 5 Cir., 497 F.2d 1384, *cert. denied,* 419 U.S. 1072, 95 S.Ct. 660, 42 L.Ed.2d 668 (1974); *United States v. Broadway,* 477 F.2d 991, 994–95 (5th Cir. 1973). The time span of four days between the two crimes certainly did not render the Magik Market robbery "too remote in time" from the Gotha robbery and murder to support admissibility. *See United States v. Arteaga-Limones,* 529 F.2d 1183, 1197–98 (5th Cir. 1976); *United States v. San Martin, supra,* 505 F.2d at 922–23.

Finally, as the case developed, the only genuine issue was whether Brunson harbored the requisite intent to help Herman rob the Gotha post office. In his statement to investigators, which was placed in evidence before the other crime evidence, Brunson admitted that he was with Herman in the post office when the crimes took place and denied only that he, Brunson, had any idea Herman was going to commit a robbery. Brunson reiterated the story throughout his later testimony at trial. The government clearly had a substantial need for evidence that Brunson had helped Herman rob the Magik Market four days earlier, for there was precious little other evidence to contradict Brunson's claim of an innocent, unknowing state of mind. We hold that the district court did not abuse its discretion in concluding that the need for this evidence outweighed its admittedly prejudicial tendency.[20]

## IV. SUFFICIENCY OF THE EVIDENCE.

Brunson's argument that the evidence was insufficient to support conviction rests on his argument that the other crimes evidence should have been excluded. Brief for Appellant at 38–39. We already have rejected the latter argument. We also have reviewed the lengthy record in this case and, viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we hold the evidence was sufficient to support conviction.

AFFIRMED.

---

**20.** Although Brunson did not object below or press the point here, we also have considered whether the district court erred in admitting this evidence at the end of the government's case in chief, rather than waiting until the conclusion of the defense case. Ordinarily the latter course is preferable, because it places the trial court in a better position to determine whether the element which the other crime evidence is offered to prove has become a material issue in the case and how substantial the need for the evidence is. *United States v. Adderly,* 529 F.2d 1178, 1182 (5th Cir. 1976); McCormick on Evidence § 190, p. 452 & n. 54 (2d ed. E. Cleary 1972); *but see* 2 Wigmore on Evidence § 307 (3d ed. 1940). We recently have held, however, that "where the government could anticipate the defense testimony because of [a] previous trial which resulted in a hung jury," it was not error to admit evidence of other crimes to show intent in the government's case in chief. *United States v. Adderly,*

*supra,* 529 F.2d at 1182; *cf. United States v. Kirk,* 528 F.2d 1057, 1060–61 (5th Cir. 1976) (admission of other crime evidence not error where "[i]t was apparent to both parties before trial that intent would be a disputed issue in this case;" unclear whether evidence was admitted in case in chief or rebuttal).

In the instant case, the government's introduction earlier in its case in chief of defendant's statement to investigators, admitting his presence at the post office but denying his intent to participate in the robbery, together with its fingerprinting evidence, foreshadowed the defense of lack of intent. Because the defense did not object on this ground below (perhaps because it agreed that intent was the primary issue), we have concluded that, at the least, plain error was not committed in permitting the evidence of the Magik Market robbery to be introduced on the issue of intent at the end of the government's case in chief. Fed.R. Crim.Pro. 52(b).