STATE OF NORTH CAROLINA v. ROBERT L. GRIFFIN

No. 53

(Filed 5 November 1975)

1. **Constitutional Law § 36; Homicide § 31— first degree murder — death penalty constitutional**

    Imposition of the death penalty upon a conviction of first degree murder was constitutional.

2. **Criminal Law § 53, 113— medical expert testimony — defining "intent" as duty of trial judge**

    The trial court in a first degree murder prosecution did not err in refusing to allow the defendant's expert medical witness who was a psychiatrist to state his definition of the word "intent," since it was the duty of the trial judge, not the psychiatrist, to explain the law and define legal terms such as "intent."

3. **Criminal Law § 53— medical expert — improper hypothetical question**

    The trial court did not err in refusing to allow defendant's expert psychiatrist to answer a hypothetical question which did not relate specifically to defendant and the facts of this case, since any answer might properly have been deemed ambiguous, and since the opinion sought as to defendant under the facts of the case was the opinion expressed in the answer to a subsequent hypothetical question.

4. **Criminal Law § 53— medical expert — hypothetical question based on prior testimony**

    Where the State's expert psychiatric witness gave extensive testimony concerning his examination of the defendant, the trial court did not err in allowing the State to ask if, based on that examination, the witness had an opinion concerning defendant's mental capacity.

5. **Homicide § 25— first degree murder — instructions proper**

    The trial court's instruction in a first degree murder prosecution that defendant "contends, Members of the Jury, that he should be acquitted of murder in the first degree and if convicted of anything, not more than murder in the second degree, but that he should in fact, so he contends, be found not guilty," was not prejudicial to defendant.

6. **Homicide § 25— first degree murder — intoxication of defendant — ability to form specific intent**

    In a first degree murder prosecution where defendant offered evidence tending to show that he was intoxicated by the drug Valium and by the alcoholic beverage beer, the trial court properly instructed the jury that in order to find that defendant could not form a specific intent to commit a felony (in the felony-murder portion of the charge) or that the defendant was mentally incapable of premeditation and deliberation (in the statutory first degree murder portion of the charge), they must find that the defendant was "utterly incapable" (or "utterly unable") of forming a specific intent, and such instruc-

tion did not shift the burden of proof with respect to specific intent to defendant.

7. **Homicide § 25— first degree murder — instructions on premeditation and deliberation — lethal blows after deceased felled**

Where the evidence in a first degree murder prosecution indicated that one shot was fired into the front of deceased's neck and that another was fired into the back of his head, the trial court did not err, in instructing on circumstantial evidence to be considered in determining whether there was premeditation and deliberation, by stating that one of the factors to be considered was "the dealing of lethal blows after the deceased had been felled and rendered helpless."

Justices LAKE and EXUM concur in the result.

APPEAL by defendant from *Fountain, J.,* at the 24 March 1975 Special Session of JONES County Superior Court.

Upon an indictment, proper in form, the defendant was convicted of murder in the first degree in the death of Clayton Jones on 26 November 1974 and sentenced to death.

The State's evidence tended to show the following.

The deceased, Clayton Jones, was a cab driver in Jacksonville, North Carolina. He was on duty about 9:00 p.m. on 26 November 1974 in the area of the Jacksonville Bus Station. On the same night, witnesses William Hargett and Fred Jones, Jr. were at Hargett's Crossroads in Jones County which is north of Jacksonville on Highway 258. About 10:40 p.m. they heard one or more gunshot blasts. These shots came from the north in the direction of a taxi earlier seen parked on the side of the road nearby. Hargett and Jones drove in that direction and observed a taxi drive off towards Kinston, a city to the north. They followed the taxi, got its license number, and observed that there was only one person in the vehicle. When they returned to Hargett's Crossroads, they found that someone had been hurt. This was reported to the sheriff along with the license number of the taxi that they had followed.

The body of Clayton Jones was found beside the road where the taxi had been parked. Medical reports indicated that the immediate cause of death was a bullet wound in the throat. Another bullet entered the back of the head and there was also an entrance and exit gunshot wound in the right wrist. A .25 caliber pistol was found in the deceased's windbreaker.

A deputy sheriff from Lenoir County had a call concerning the incident and proceeded from Kinston towards Jacksonville

on Highway 258 sometime after 10:00 p.m. He met the described taxi about five or six miles from Hargett's Crossroads. He turned around, followed the vehicle for four miles, and called for assistance. The vehicle was being operated normally. State highway patrolmen stopped the vehicle. The defendant was the only occupant and was behind the wheel. They found a .22 caliber pistol with four live rounds and two empty shells in it under the front seat and a paper bag containing $44.30 in the center of the front seat.

Defendant Griffin told the officers he was a cab driver and knew nothing about the Hargett's Crossroads incident. He did not appear under the influence of drugs or alcohol. He was arrested and taken to the county courthouse in Trenton.

Sometime after midnight, the defendant was interrogated by a SBI agent after Miranda warnings were given and a written waiver of rights was executed. Subsequently he made a statement that his name was Robert Griffin, that he was not in the military service, and that he worked for the Howard Johnson Cab Company. He gave an address of 4602 Midway Park. It was determined that there was no Howard Johnson Cab Company and the address was nonexistent.

Later defendant was again advised of his constitutional rights and interrogated by another SBI agent. He was told that his first statement was incorrect and then was permitted to make a telephone call. Thereupon he said that he left Camp Lejeune about 9:30 p.m. to go to Jacksonville, arriving about 10:00 p.m.; that he caught a cab, paying the cab driver $8.00 (this being all the money he had) to take him to Richlands; and that he really wanted to go see his girl friend in Kinston. When they got to Richlands he pretended to be sick and asked the cab driver to stop so he could relieve his tension. He got out, and pulled the .22 caliber pistol that he had gotten from the barracks at Camp Lejeune. The cab driver got out and was coming towards him with a stick. He fired twice at the cab driver and then got in the taxi cab and left, being later picked up by the police. Defendant was asked for identification. He said he had stuffed his ID card behind the seat of the patrol car where it was later found.

The defendant gave a written statement about 3:20 a.m. as follows: "I (the defendant) left Camp Lejeune at 9:20 p.m. on Tuesday on my way to Kinston but I missed the bus and got

into a cab at Camp Lejeune to go to Jacksonville; that there I got into another cab going to Kinston and about seven miles from Kinston asked the cab driver to stop so I could relieve some tension; that he stopped and I pulled out a .22 caliber pistol and told him to get out of the cab and walk down the road; as he was walking he turned and ran at me with something in his hand; I told him that I did not want to shoot him if he would just stay clear of me but that I had no choice but to do what I did."

About two weeks before the trial (some three and one-half months after the killing) the billfold of the deceased, with his driver's license in it, was found on the side of a loop road that runs from Highway 258 some eight miles from Hargett's Crossroads. The billfold appeared to be the same one he had had about 9:00 p.m. on 26 November 1974 when he went to the home of the cab owner to pay him the money he owed from the previous week's operation.

The defendant's evidence tended to show the following.

The defendant, Robert L. Griffin, testified in his own behalf and said that he was in the Marine Corps and had a wreck on 25 November 1974 which resulted in his having pain in his back and head. He reported to the dispensary the next morning. X-rays taken were normal. He was given twelve transquilizer tablets (Valium) and some Tylenol and placed on a no duty status for four days. He continued to feel badly all day and about 8:30 p.m. on the night of 26 November 1974 he took two more Valium tablets and decided to go to Kinston to see his fiancee. He left Camp Lejeune with $56.00 or more and caught a cab to Jacksonville at a cost of $4.00, intending to catch a bus to Kinston. He missed the bus, wandered around Jacksonville for a while and stopped to drink a beer. He ran into a man who offered to sell him a .22 pistol for $25.00, and he bought it for his own protection. He then went back toward the bus station, hailed a cab, and paid $27.00 in advance for a ride to Kinston. After a few miles, defendant felt sick, asked the cab driver to pull over, and he got out. He vomited and got back in the cab. Later he got upset with the driver, but testified that the driver had given him no cause to be angry. He pulled the pistol out and demanded the driver to stop on the side of the road and get out of the vehicle. He told him to start walking and defendant began to climb into the driver's side of the taxi cab. He observed the driver turn around and start coming

towards him with something in his hand. He fired one shot and after a lapse of seconds another shot, but he did not remember whether the driver fell or whether he shot him in the back of the head while he was lying on the ground. Defendant then got in the cab and drove down the highway until he was stopped by the police. He said that he never intended to shoot or rob anybody.

A psychiatrist examined the defendant about one week before the trial and his evidence tended to show that Valium can occasionally have extreme side effects and that defendant was having such a reaction on the night of Jones' death. In his opinion this might have prevented defendant from forming a plan or intent to kill, but he probably knew right from wrong on 26 November 1974.

The State called in rebuttal Dr. Taylor, a psychiatrist from Dorothea Dix Hospital, who gave as his opinion that defendant knew right from wrong and had the ability to form an intent to kill at the time of the killing.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General Edwin M. Speas, Jr. and Associate Attorney Elizabeth R. Cochrane for the State.*

*William J. Morgan and Grady Mercer, Jr. for defendant appellant.*

COPELAND, Justice.

[1] Defendant's first assignment of error relates to the alleged unconstitutionality of the judgment and sentence of death. Our Court has considered this on many occasions and found such argument to be without merit. *State v. Young*, 287 N.C. 377, 214 S.E. 2d 763 (1975) ; *State v. Armstrong*, 287 N.C. 60, 212 S.E. 2d 894 (1975) ; *State v. Vick*, 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Lowery*, 286 N.C. 698, 213 S.E. 2d 255 (1975) ; *State v. Simmons*, 286 N.C. 681, 213 S.E. 2d 280 (1975) ; *State v. Stegmann*, 286 N.C. 638, 213 S.E. 2d 262 (1975) ; *State v. Woods*, 286 N.C. 612, 213 S.E. 2d 214 (1975) ; *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975) ; *State v. Avery*, 286 N.C. 459, 212 S.E. 2d 142 (1975) ; *State v. Williams*, 286 N.C. 422, 212 S.E. 2d 113 (1975) ; *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973). This assignment of error is overruled.

State v. Griffin

[2]    Next the defendant contends that the court erred in refusing to allow the defendant's expert medical witness to state his definition of the word "intent." The witness was a medical expert in the field of psychiatry. The defendant contends that in order for this witness to express his expert opinion it became necessary for him to be allowed to define the terms that would be used in his testimony. The defendant further contends that even though the judge instructed the jury about "intent," this came long after the testimony of the expert and it was absolutely necessary for this witness to explain what he considered the word "intent" meant in order to relate this to his testimony.

It is the duty of the trial judge, not the psychiatrist, to explain the law and define legal terms such as "intent." G.S. 1-180. "Intent" has a legal meaning somewhat different from a psychiatric definition, particularly the one proffered in this case out of the presence of the jury. As stated in *State v. Bell,* 285 N.C. 746, 750, 208 S.E. 2d 506, 508 (1974), "Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. [Citations omitted.]" The opinion of an expert witness is admissible in either of two situations: "(1) where the facts cannot adequately be presented to the jury, or (2) where the witness is better qualified than the jury to draw appropriate inferences from the facts." 1 Stansbury, N. C. Evidence, § 132 (Brandis Rev. 1973). If the psychiatrist were permitted to give definitions to words that must later be given their legal definitions, this could confuse and possibly mislead the jury. It is within the trial court's discretion to limit such potential confusion. In this case the psychiatrist was permitted to give his opinion of the mental condition of the defendant. It was not necessary that he give a psychiatrist's definition of the term "intent" in order to express his opinion. The trial judge later properly defined "intent." This assignment of error is without merit and is overruled.

[3]    Next the defendant contends that the court committed prejudicial error in refusing to allow the expert psychiatrist to testify as to his opinion as to whether a person who was unable to conclude a complete thought or whose thoughts have no logical connection would be able to form successfully a specific plan or design to perform an act.

This assignment arose from a hypothetical question. The objection of the State was sustained. Counsel for defendant

then composed a more complete hypothetical question relating specifically to defendant and the facts of this case and the witness was permitted to answer it. "It is customary to incorporate in a hypothetical question the relevant facts in evidence which counsel hopes will be accepted as true by the jury, and to ask the witness his opinion based on such facts *if* the jury shall believe them to be facts." 1 Stansbury, N. C. Evidence, § 137 (Brandis Rev. 1973). The first hypothetical question was deficient because it did not relate specifically to defendant and the facts of this case and any answer might properly have been deemed ambiguous. Furthermore, since the opinion sought as to defendant under the facts of this case was the opinion expressed in the answer to a subsequent hypothetical question, there was absolutely no prejudice in refusing to allow the psychiatrist to answer the first question. This assignment of error is without merit and is overruled.

[4] Next the defendant contends it was error to allow the State's expert psychiatrist to testify as a rebuttal witness and answer a purported hypothetical question calling for multiple opinions without the inclusion of the necessary facts within the question.

We have a different situation here from the hypothetical question posed to defendant's witness. The State's witness gave extensive testimony concerning his examination of the defendant. Following this he was asked if, based on that examination, he had an opinion concerning defendant's mental capacity. It is obvious from the record that the facts on which he based his opinion were clear. The question and the answer were proper under these circumstances. 1 Stansbury, N. C. Evidence, § 137 (Brandis Rev. 1973). This assignment is without merit and is overruled.

[5] Next, the defendant contends that the court committed prejudicial error in its charge to the jury when they were told that the defendant contended that he should be found "not guilty" of all charges.

The court charged the jury in the following language: "So he contends, Members of the Jury, that he should be acquitted of murder in the first degree and if convicted of anything, not more than murder in the second degree, but that he should in fact, so he contends, be found not guilty."

In this connection the defendant asserts that this was error on the ground that his admission of the shooting amounted to an admission of second-degree murder and that the above statement by the trial judge was a misstatement of the defendant's position. In effect, defendant is contending that the trial judge expressed an opinion in violation of G.S. 1-180.

In North Carolina when a defendant is charged with first-degree murder, he is not permitted to plead guilty to it. Certainly this does not work to the disadvantage of the defendant. The purpose of this rule is for the defendant's protection and thereby requires the State to prove all the elements of the offense beyond a reasonable doubt. It is true, as the defendant contends, that defendant's own testimony shows elements of second-degree murder. This was noted by the trial judge, but it is also significant that defendant did not admit killing deceased. His plea of not guilty put into issue all of the elements of the charges against him and the burden remained on the State to satisfy the jury beyond a reasonable doubt of all of the elements of the offense charged, including the lesser offense of second-degree murder. *See State v. Lewis*, 274 N.C. 438, 164 S.E. 2d 177 (1968); *State v. Ramey*, 273 N.C. 325, 160 S.E. 2d 56 (1968). The proper placing of the burden on the State as the law requires was an advantage to the defendant. Certainly it was not to his prejudice. This assignment of error is overruled.

[6]  Next the defendant contends that the trial court erred in instructing the jury that in order to find that defendant could not form a specific intent to commit a felony (in the felony-murder portion of the charge) or that the defendant was mentally incapable of premeditation and deliberation (in the statutory first-degree murder portion of the charge) that they must find that the defendant was "utterly incapable" (or "utterly unable") of forming a specific intent. Defendant contends that this was a shifting of the burden of proof and that it placed too heavy a burden upon him.

In the felony-murder instruction, the trial judge told the jury that they could not convict the defendant under this theory if they found "that he was *utterly incapable* of forming the felonious intent" to commit robbery. (Emphasis supplied.) In the alternative instruction on statutory first-degree murder (requiring the proof of the elements of premeditation and deliberation) the court likewise told the jury that they could not

convict the defendant of murder in the first degree if they found "that he was *utterly incapable* of forming the *specific intent* to kill or to plan and design the doing of that act, . . ." (Emphasis supplied.) The court stated that under such circumstances "he would have been mentally incapable of premeditating and deliberating."

In the present case defendant offered evidence tending to show that he was intoxicated by the drug Valium and by the alcoholic beverage beer. It was essentially on this basis the defendant contended that the State had failed to prove he had the requisite intent under the alternative charges.

"The rule that voluntary intoxication is not a general defense to a charge of crime based on acts committed while drunk is so universally accepted as not to require the citation of cases." 8 A.L.R. 3d 1236 at 1240 ("Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge"). In some jurisdictions the jury is not allowed to consider voluntary intoxication even on issues of specific intent. *Id.* at 1241. Another writer concludes, "Of course, intoxication itself does not preclude a finding that the requisite mental element was present, unless it was so extreme as to render the accused *entirely incapable of the state of mind required.* Where the offense is one requiring a specific intent, evidence of voluntary intoxication is admissible and may be considered in determining whether such specific intent was actually present, although it acts as a complete defense only where the degree of intoxication is such as to render the accused *incapable of entertaining the specific intent.*" (Emphasis supplied.) 21 Am. Jur. 2d § 107, 186.

In *State v. Propst,* 274 N.C. 62, 72, 161 S.E. 2d 560, 567 (1968) our Court enunciated the following rule: "[I]f it be shown that an offender, charged with such crime, is so drunk that he is *utterly unable* to form or entertain this essential purpose, he should not be convicted of the higher offense." (Emphasis supplied.) The able trial judge followed the guideline of *Propst* explicitly. The contention of the defendant that the burden of proof was shifted is incorrect. The burden of proving *specific intent* was properly placed upon the State in the instruction. The words used by the court, "utterly incapable," merely related to the degree of intoxication and not to the shifting of the burden. The jury certainly understood that the court meant that the defendant must have lost control of his mind through intoxication in order to be *unable* to form the

*specific intent.* This assignment of error is without merit and is overruled.

[7]  Finally, defendant contends that the trial court committed error in its instruction on first-degree murder under the premeditation and deliberation theory when it told the jury that they could consider the "dealing of lethal blows after the deceased had been felled and rendered helpless" on the ground that there was no evidence of such blows and to so instruct would be interpreted as an expression of opinion by the presiding judge.

As Justice Sharp (now Chief Justice) said in *State v. Van Landingham,* 283 N.C. 589, 599, 197 S.E. 2d 539, 545 (1973): "Ordinarily it is not possible to prove premeditation and deliberation by direct evidence. These facts must be established by proof of circumstances from which they may be inferred. Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of the defendant before and after the killing; the use of gross excessive force, *or the dealing of lethal blows after the deceased has been felled."* (Emphasis supplied.) *See State v. Walters* and cases cited therein, 275 N.C. 615, 623-24, 170 S.E. 2d 484, 490 (1969). *See also State v. Buchanan,* 287 N.C. 408, 422, 215 S.E. 2d 80, 88 (1975).

Judge Fountain's instructions on circumstantial evidence to be considered in determining whether there was premeditation and deliberation are almost identical to those used by our Court in *Van Landingham* with the deletion of any reference to gross and excessive force as a factor. Moreover, in this case there was sufficient evidence upon which to base the instructions given. The record bears out a want of provocation. The defendant's own testimony indicated that the deceased had done nothing to make him angry and that in fact he had been nice to him. There was evidence of unusual conduct on the part of defendant before and after the killing. In particular, the purchase of the pistol, the demand to stop the cab, and the flight of the defendant from the scene of the shooting indicated that the defendant had a plan. The firing of two or more shots at close range under the circumstances admitted by defendant would certainly be considered the use of unnecessary force.

The defendant particularly objects to that portion of the charge stating that one of the factors to be considered was "the

dealing of lethal blows after the deceased had been felled and rendered helpless." Defendant contends that there is no evidence of this circumstance. The record is to the contrary. The evidence indicated that one shot was fired into the front of deceased's neck and that another was fired into the back of his head. Defendant testified that the deceased was in front of him when he fired and that there was a lapse of seconds between shots. Certainly one explanation of the bullet wound in the back of the head is that it was fired after the deceased was shot the first time and had fallen to the ground. The defendant testified that he did not remember if he shot the deceased in the back of the head after he fell. *See State v. Buchanan, supra,* for a similar instruction where there was no evidence of a blow after deceased fell. This assignment of error is overruled.

Defendant's court-appointed counsel have with diligence searched the record and made numerous assignments of error. The argument and the brief of the Attorney General's office have ably answered each assignment of error. Because this is a capital case, we have carefully considered all of the assignments and conclude that there is

No error.

Justices LAKE and EXUM concur in the result.