STATE OF NORTH CAROLINA v. TOMMY MORGAN

No. 71

(Filed 1 February 1980)

1. **Criminal Law § 75.2— confession—no mental or psychological pressure exerted**

    Officers did not exert such mental or psychological pressure against defendant so as to overcome his will and thereby induce a confession which defendant was not otherwise disposed to make where the evidence tended to show that defendant was questioned for approximately six hours before he first made his incriminating statements and was told on at least two occasions during that time that he was free to leave, but defendant instead chose to remain in the sheriff's office and continued to answer questions; four different officers questioned defendant at different times, but there was no suggestion that defendant was at any time bullied by the presence and questioning of a group of interrogators; and an officer's insistence to defendant that he tell the truth was not accompanied by any sort of threat or deprivation.

2. **Criminal Law § 75.1— confession made in sheriff's office—defendant not under arrest**

    There was no merit to defendant's contention that his incriminating statement resulted from an illegal arrest, since, at the time officers talked with defendant, they did not consider him to be a suspect in the case but simply wanted to talk to him about a radio in his possession which was like one owned by the murder victim; defendant was allowed to go back into his home unaccompanied to get dressed after first talking with the deputies; on two occasions during the deputies' interview with defendant, he was told that he was

State v. Morgan

free to go; defendant was not frisked, handcuffed, or in any other way treated as if he were incarcerated; and defendant therefore was not under arrest at the time he made the statement.

**3. Criminal Law § 53— testimony by forensic pathologist—form of questions—nonresponsive answer—opinion as to cause of death**

An expert in the field of forensic pathology who had examined skeletal remains was qualified to state an opinion as to what was the probable cause of death without the intervention of a hypothetical question and without couching his testimony in terms of what might have or could have caused death; furthermore, the fact that the witness testified concerning identification of the remains as well as the cause of death when questions propounded by the district attorney did not call for such opinion testimony did not require exclusion of the answers since they stated relevant facts, and the expert witness could properly state his opinion as to cause of death without invading the province of the jury.

**4. Criminal Law § 102.3— improper jury argument—time for taking exception**

When counsel makes an improper remark in his jury argument, an exception must be taken before verdict or the alleged impropriety is waived.

**5. Homicide § 21.7— defendant's exculpatory statement—evidence casting doubt on statement—sufficiency of evidence**

There was no merit to defendant's contention that the State, by introducing defendant's confession in which he claimed the killing of the victim was an accident, was bound entirely by the purported truth of that statement and that the charge against him therefore should have been dismissed, since the State offered evidence which cast doubt on defendant's statement that the killing was accidental, including evidence that defendant had made up his mind to rob the victim and went to his place of work for that purpose, although he kept changing his mind from time to time throughout the course of his activities on whether to go through with his intention; defendant lied to the victim about the condition of the victim's father and thereby induced the victim to close the produce stand which he was operating; defendant did not take the victim to his home but instead took him to a remote area of the county where he induced the victim to get out of the car by lying to him about the presence nearby of some marijuana plants; defendant walked into the woods carrying a shotgun, falsely saying that it was for the purpose of killing rabbits; and defendant did not assist the victim in any manner after he was shot but instead ran away frightened from the area.

**6. Homicide § 24.3— death by accident—burden of proving crime properly placed on State**

The trial court's instruction with respect to death by accident properly placed the burden on the State to prove each and every element of the crime charged beyond a reasonable doubt, thereby disproving defendant's assertion of an accidental death.

APPEAL by defendant from *Barbee, S.J.,* 29 January 1979 Regular Criminal Session, SCOTLAND Superior Court.

State v. Morgan

Upon a plea of not guilty, defendant was tried on a bill of indictment proper in form which charged him with the murder of Bobby Smith. The state presented evidence summarized in pertinent part as follows:

On 28 August 1976, Bobby Smith, 25, left his home in Laurinburg, North Carolina, with his father en route to a small produce stand belonging to Mr. Smith located on Highway 74 between Laurinburg and Maxton. Before they went to the produce stand, Bobby and his father visited the store of Howard Fields, a dealer in electronic equipment, in Maxton. While they were at the store, Mr. Smith purchased several items of electrical equipment for Bobby to use with his citizen band radio. These items included an antenna and an adapter box which provided a power source for the radio.

Bobby was then taken by his father to the produce stand. Though he was somewhat mentally retarded, Bobby was able to operate the produce stand by himself. Unable to read and write, he nevertheless was able to handle arithmetic proficiently enough to enable him to sell produce to the customers who came to the stand. At the time his father left him at the stand, approximately 10:00 a.m., Bobby had in his possession a paper bag containing $180, $100 in currency and $80 in change.

On that evening, at approximately eight o'clock, Bobby's mother, Mrs. Grace Smith, arrived at the produce stand to take her son home for the night. Bobby did not have a driver's license, and it was customary for his parents to take him to work in the morning and return for him in the evening. When Mrs. Smith drove up to the stand, it was closed and locked. She did not notice anything unusual about the area except that her son was nowhere to be found. After searching the immediate area around the stand for her son, Mrs. Smith returned to their home, called her husband at another produce stand which he owned, and asked whether Bobby was with him. After learning that Bobby was not there, she returned to the stand near Maxton where she was later joined by her husband. A search of the premises showed that the "CB" radio antenna which had been purchased earlier in the day was still in the stand but that all of the money which had been in Bobby's possession was gone. Thereafter, a search was conducted by members of the Scotland County Sheriff's Department, the

State Bureau of Investigation, the Federal Bureau of Investigation, and members of the community. The search failed to reveal the whereabouts of Bobby.

On 27 November 1976 members of a hunting party, while hunting in the northern portion of Scotland County, discovered what appeared to be a human skull and other bones of various sizes. Law enforcement officers who were summoned to the scene gathered the remains which were taken to the office of the Chief Medical Examiner in Chapel Hill. Tests and examinations conducted by Dr. Page Hudson, Chief Medical Examiner of the State of North Carolina, and members of his staff, indicated that the bones were those of a white male between twenty and thirty, approximately six feet tall and who had been dead more than two months but less than one year. A comparison of dental records led Dr. William P. Webster, a forensic odontologist on the medical examiner's staff, to conclude that the remains were those of Bobby Smith.

On 6 March 1978 the Scotland County Sheriff's Department had received information that defendant had attempted to sell a radio similar to the one which Bobby Smith had at the time of his death. Between 8:00 a.m. and 8:30 a.m. on that date, two deputies went to defendant's home and, at their invitation, defendant went with them to the sheriff's office. After arriving at the sheriff's office, defendant was advised of his constitutional rights and executed a written waiver of rights. At the same time he was informed of his rights, defendant was informed that the officers had information that he had a "CB" radio similar to that which had been owned by Bobby Smith and that he had been trying to sell it.

After being questioned by police officers for several hours, defendant made an incriminating statement. In his statement, he admitted that on the day Bobby Smith was killed, he had made up his mind to rob Bobby; that he kept changing his mind; that he went to the produce stand where he knew Bobby worked; that he told Bobby that his father's feet were "acting up again" and that he had been asked to pick Bobby up; that he helped Bobby close the produce stand; that instead of taking Bobby home, he took him to a rural section of Scotland County, telling Bobby that he had marijuana planted nearby; that he took his shotgun with him

when they left the car and proceeded into the woods; that while they were walking through the woods, he tripped over some vines; that the gun discharged as he fell, wounding Bobby in the chest and stomach; that upon seeing Bobby fall, he became frightened and ran away from the scene; that he threw the shotgun out on a highway between Laurel Hill and Old Hundred; and that he threw Bobby's "CB" radio in a pond near Old Hundred.

At the conclusion of the state's evidence, defendant chose not to offer any evidence, and the jury returned a verdict finding him guilty of second-degree murder. The court entered judgment sentencing defendant to life imprisonment.

Other facts which are pertinent to this appeal will be discussed in the opinion.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Donald W. Stephens and Assistant Attorney General J. Michael Carpenter, for the State.*

*Kenneth S. Etheridge for defendant-appellant.*

BRITT, Justice.

In his brief defendant brings forward and argues 29 assignments of error. We find no merit in any of the assignments and will discuss only those which we consider important.

Defendant makes a two-pronged attack on the admissibility of evidence relating to statements he allegedly made to police officers at the sheriff's offices on 6 March 1978. He argues that the statements were unconstitutionally obtained in that they were given (1) involuntarily as the products of psychological coercion, and (2) pursuant to an illegal arrest. We are not impressed with either argument.

Prior to admitting the challenged evidence, the court conducted an extensive voir dire hearing in the absence of the jury. Following the hearing the court made findings of fact which are fully supported by the evidence, consequently we are bound by the findings. 4 Strong's N.C. Index 3d, Criminal Law § 76.10. The court also made conclusions of law which are fully supported by the findings of fact.

Portions of the court's findings of fact pertinent to the questions being discussed are summarized as follows:

1. On or about 6 March 1978 Detective A. W. Oxendine and Sgt. Walter Sims of the Scotland County Sheriff's Department were investigating the disappearance of Bobby Smith who allegedly disappeared on 28 August 1976. Det. Oxendine, after receiving information that defendant had made an offer to sell a CB radio to one James Larkin, asked Sgt. Sims to go with him to defendant's home. They arrived at defendant's residence around 8:30 a.m. Det. Oxendine blew the car horn and defendant, without a shirt on, came out of his residence. Det. Oxendine identified himself and told defendant that they would like to talk to him at the sheriff's department. Defendant returned to the inside of his home and later came back to the police vehicle and entered the backseat. Neither officer at this time told defendant what they wanted to discuss with him. On the way to the sheriff's department, there was no conversation between defendant and the officers. The officers did not have an arrest warrant.

2. The officers and defendant arrived at the sheriff's department around 8:50 a.m. They went into a deputies' office which is about 22 feet by 22 feet; the office has a window and there were several desks with chairs in the office; and there was also a telephone which was operational.

3. After the three of them entered the deputies' office, the officers left temporarily and called S.B.I. Agent Van Parker who was also investigating the case. Upon returning to the office, Det. Oxendine and Sgt. Sims advised defendant that they had received information that defendant had tried to sell a CB radio to James Larkin; that the radio was similar to one that Bobby Smith had at the time he disappeared; and that they wanted to ask defendant some questions "about that matter".

4. Det. Oxendine then advised defendant of his constitutional rights. Defendant appeared to understand his rights and said that he did not want a lawyer present. Defendant was advised of his rights around 9:00 a.m. and he signed a waiver of rights form in the presence of Oxendine and Sims.

5. Thereafter Officers Oxendine and Sims began to question defendant about the CB radio. Defendant gave several conflicting

statements about the radio including an assertion that he had stolen it from a car at the Cinema Theater parking lot.

6. At around 11:00 a.m., after Oxendine and Sims had alternated in asking defendant questions about the radio, Oxendine asked defendant if he wanted to leave or go to work and defendant replied that he was not going to work. Oxendine asked him if he wanted to call anybody and defendant replied that his wife knew where he was. The officers also told defendant that he was free to leave at any time he chose to do so.

7. Defendant declined to leave and Sims asked him again about the CB radio. He told defendant that he was not a "rogue" or "thief" and to tell him where the radio was. Sims also asked defendant if he wanted anything, and defendant replied that he wanted a Mountain Dew, some crackers and some cigarettes. Defendant gave Sims a dollar after which Sims went and purchased and brought to defendant the cigarettes, crackers and Mountain Dew which he requested.

8. Thereafter Sims left the room and Agent Parker and Det. Siler went in and questioned defendant. This questioning continued until about 2:00 p.m. A little later Sims returned to the room where defendant was alone and asked defendant again about the CB radio. Shortly thereafter, defendant gave the officers the incriminating statements hereinbefore summarized.

9. Defendant first made the incriminating statements shortly after 2:00 p.m. Thereafter, and until around 5:45 p.m., the officers engaged in the process of reducing their questions and defendant's answers and statements to writing.

10. Defendant was 20 years of age and had a ninth grade education at the time the statements were allegedly made. He was in good physical and mental condition and while in the deputies' office he was offered food and was also given permission to use the telephone to call anyone he desired.

11. Defendant was not under arrest at the time he was questioned by the officers and at the time he made his incriminating statements. He was free to leave at any time and was so advised by the officers. Defendant voluntarily, understandingly, knowingly and intelligently made the statements to Officers Oxendine, Sims and Parker.

The court concluded as a matter of law that defendant was properly advised of his constitutional rights as set forth under the *Miranda* decision; that he was in full understanding of his constitutional rights to remain silent, his right to counsel and all other rights; and that defendant purposely, freely, knowingly, understandingly, intelligently and voluntarily waived each of those rights and made statements to the officers above named.

[1] Defendant points to the facts and circumstances surrounding his presence at the sheriff's offices and urges this court to conclude that the totality of the attendant circumstances amounted to psychological coercion of a confession.

It is a basic principle of criminal law that an involuntary confession is inadmissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed. 2d 854, 93 S.Ct. 2041 (1973); *State v. Braxton*, 294 N.C. 446, 242 S.E. 2d 769 (1978). A confession is involuntary when it is coerced, either by physical force, *see e.g., Beecher v. Alabama*, 408 U.S. 234, 33 L.Ed. 2d 317, 92 S.Ct. 2282 (1972) (per curiam); *Clewis v. Texas*, 386 U.S. 707, 18 L.Ed. 2d 423, 87 S.Ct. 1338 (1967), or by mental pressure, *Lynumn v. Illinois*, 372 U.S. 528, 9 L.Ed. 2d 922, 83 S.Ct. 917 (1963); *State v. Chamberlain*, 263 N.C. 406, 139 S.E. 2d 620 (1965). There is no suggestion or evidence in the present case that there was any physical force exerted against defendant. Our inquiry, therefore, is confined to the consideration of whether, from the totality of circumstances, *see generally* Cook, Constitutional Rights of the Accused: Trial Rights § 74 (1974), such mental or psychological pressure was brought to bear against defendant so as to overcome his will and thereby induce a confession that he was otherwise not disposed to make. We agree with the trial court that the officers in this case did not exert such pressure.

While it is true that defendant was questioned for a substantial period of time, before he first made his incriminating statement, approximately six hours, in a foreign environment, there is nothing in the record which indicates that he was subjected to deprivation or abuse in the course of the questioning.

Psychological coercion sufficient to render a confession involuntary manifests itself in a number of ways. *See generally* 3 Wharton's Criminal Evidence §§ 674-685 (13th ed. 1973). Interrogation by law enforcement officers may be so prolonged as to

render a confession involuntary. *Clewis v. Texas, supra; Davis v. North Carolina*, 384 U.S. 737, 16 L.Ed. 2d 895, 86 S.Ct. 1761 (1966). While defendant was questioned for approximately six hours before he first made his incriminating statements, on at least two occasions he was told that he was free to leave. He did not leave but remained seated in the office and continued to answer questions.

The use of multiple interrogators is a factor which may cause a confession to be deemed involuntary. *See generally*, Cook, Constitutional Rights of the Accused: Trial Rights § 74 (1974). In *Ashcraft v. Tennessee*, 322 U.S. 143, 88 L.Ed. 1192, 64 S.Ct. 921 (1944), the defendant was questioned continuously for thirty-six hours by relays of officers. The procedure was found to be so inherently coercive that it rendered the confession obtained from the accused to be involuntary. However, a careful consideration of the cases which have addressed this issue shows that the multiplicity of interrogators becomes an important factor in determining the voluntariness of a confession when the interrogation complained of extends over a prolonged period. *See, e.g., Watts v. Indiana*, 338 U.S. 49, 93 L.Ed. 1801, 69 S.Ct. 1347 (1949); *Haley v. Ohio*, 332 U.S. 596, 92 L.Ed. 224, 68 S.Ct. 302 (1948).

The period of time in which defendant was questioned in the case at hand was less than one-fourth the time the defendant was questioned in *Ashcraft*. We observed earlier that the interrogation was not so protracted that it resulted in an involuntary confession in light of the fact that defendant was informed that he was free to leave and go to work but instead elected to remain in the office and talk with the officers. While four different officers participated in questioning defendant, there is nothing in the record which indicates that their questioning was so relentless or overbearing that a valid objection to their conduct could be raised. There is evidence which indicates that the various officers went into the room in intervals, and different officers questioned defendant at different times. Nothing suggests, however, that at any time in the course of the questioning was defendant bullied by the presence and questioning of a group of interrogators.

A mere adjuration to a criminal suspect to speak the truth does not in and of itself render a subsequent confession involuntary. *Sparf v. United States*, 156 U.S. 51, 39 L.Ed. 343, 15 S.Ct.

273 (1895); *State v. Thompson*, 227 N.C. 19, 40 S.E. 2d 620 (1946). On *voir dire*, Officer Sims testified that he told defendant that he "knew he was no rogue nor a thief and to go ahead and tell me what he had done with the 'CB'." There is no evidence in the record which indicates that this insistence to defendant that he tell the truth was accompanied by any sort of threat or deprivation. It, therefore, follows that Officer Sims' statement to defendant did not render his subsequent confession involuntary.

In light of the foregoing discussion, we find no basis upon which to conclude that defendant's statement was involuntarily given.

[2] There is no validity in defendant's claim that his incriminating statement resulted from an illegal arrest for the simple reason that he was not under arrest at the time he made the statement. An arrest occurs when law enforcement officers interrupt the activities of an individual and significantly restrict his freedom of action. *Cf. Terry v. Ohio*, 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968). *Henry v. United States*, 361 U.S. 98, 4 L.Ed. 2d 134, 80 S.Ct. 168 (1959). The dispositive issue is not the label which is appended to the encounter between law enforcement officers and an individual but whether the individual has been deprived of his freedom of action by way of a seizure. *See generally* 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.1(a) (1978). A person is not arrested if he is free to choose whether to enter or continue an encounter with law enforcement officers and elects to do so. *United States v. Brunson*, 549 F. 2d 348 (5th Cir.), *cert. denied*, 54 L.Ed. 107 (1977); *see also United States v. Bailey*, 447 F. 2d 735 (5th Cir. 1971) (A postman's voluntary act in accompanying postal inspectors to post office when he had completed his day's work did not constitute an arrest.); *Doran v. United States*, 421 F. 2d 865 (9th Cir. 1970). (There was no arrest where defendant voluntarily accompanied agents to the place where he was questioned in light of the fact that on two occasions he was informed that he was not under arrest and was free to leave.)

The case of *United States v. Brunson, supra*, is particularly instructive. In *Brunson*, the authorities were investigating the armed robbery of a post office and the murder of its postmistress. A witness heard several shots fired and saw two black men come

out of the building and drive off in a light colored Cadillac. Fingerprints lifted from the counter in the building were found to match those of one Glen Herman who had recently purchased such an automobile. The authorities launched an intensive effort to locate Herman or anyone who knew him. In the course of the investigation, the investigators came to believe that one of Herman's associates was Aaron Brunson. A number of postal inspectors and a sheriff's deputy went to his home and asked him to accompany them to headquarters. The officers told Brunson that he was not under arrest and that they would later take him back to his home when the questioning was completed. The questioning was for the purpose of helping the officers locate Herman. When the officers and Brunson arrived at the Orange County (Florida) Sheriff's Department, Brunson was advised of his *Miranda* rights. After executing a written waiver, he began talking with the officers and later made an incriminating statement, implicating himself in the robbery and murder at the post office. It was only after he made the confession that Brunson was formally arrested. On appeal, Brunson contended that the trial court erred in refusing to suppress his confession as the product of an illegal arrest. The United States Court of Appeals for the Fifth Circuit affirmed Brunson's conviction, holding that at the time he made the confession, Brunson was not under arrest. In so holding, the Court of Appeals made several pertinent observations which may be profitably applied to the present case.

(1) In *Brunson*, there was evidence which showed that the investigators had not focused on Brunson as a suspect, let alone obtained sufficient information to constitute probable cause as to him individually. In the present case, the deputies only had information from a confidential informant that defendant had in his possession an unusual "CB" radio which he had been trying to sell. The radio was similar to the one which Bobby Smith kept at the produce stand. There was no evidence in their possession at that time which linked defendant to Bobby's disappearance and death.

(2) In *Brunson*, there was evidence that the investigators wanted to talk with Brunson so that they might come to know the whereabouts of Glen Herman, *upon whom the investigation had focused*. Here, however, it will be remembered that the deputies had only minimal evidence which led them to desire to talk with

defendant. On *voir dire*, Deputy Sims testified that when he and Deputy Oxendine went to defendant's home, *he did not consider him to be a suspect in the case.*

(3) In *Brunson,* the investigators told him that he was not under arrest; that they intended to drive him home after the interview; and that they wanted him to go with them voluntarily. In the present case, defendant was allowed to go back into his home *unaccompanied* to get dressed after first talking with the deputies. On one occasion during the interview, defendant was offered the opportunity to go to work, but he declined. Shortly thereafter, he was told that he was free to go, but he, instead, elected to remain at the sheriff's office and continue talking with the officers.

(4) Neither Brunson nor the present defendant were treated as though they were incarcerated. In neither case were the individuals frisked or handcuffed when they accompanied the officers. Not until after each had made an incriminating statement were they subjected to any sort of physical contact with law enforcement officers.

In summary, from all that appears in the record, defendant was not restrained in his freedom to walk away. It cannot be argued, therefore, that he was seized in the Fourth Amendment sense of that term.                                                                    .

Defendant refers this court to the recent decision of the United States Supreme Court in *Dunaway v. New York,* 60 L.Ed. 2d 824, 99 S.Ct. 2248 (1979), in support of his argument that his confession ought to have been suppressed as the fruit of an illegal arrest. Defendant's reliance upon *Dunaway* is misplaced because it cannot be properly applied to the facts in this case. *See State v. Reynolds,* 298 N.C. 380, 259 S.E. 2d 843 (1979) ("While this decision . . . clearly has major ramifications with respect to the question of custodial interrogation on less than probable cause, we do not believe that it controls the case at bar.")

*Dunaway* stands for the proposition that when a criminal defendant has been *seized* on less than probable cause and subsequently makes an incriminating statement, that statement must be suppressed as "the fruit of the poisonous tree" unless the effect of the illegal arrest has become sufficiently attenuated.

*Dunaway v. New York*, 60 L. Ed. 2d at 839. We observed above that defendant was not *seized* in the Fourth Amendment sense of that term in that he was not restrained of his liberty by the officers to the extent that he could not break off the questioning and leave them if he had so desired. He voluntarily entered into and continued the encounter with the officers. The voluntariness of the encounter was brought home to defendant by the officers in the manner in which they conducted the proceeding and by advising on two different occasions that he was free to go to work or otherwise leave the sheriff's office. This atmosphere is to be contrasted with that found in *Dunaway*. In *Dunaway*, the defendant was involuntarily accosted and taken to a police station for questioning. There was evidence which indicated that defendant was not free to leave if he had wanted to do so. Furthermore, there was evidence in *Dunaway* that the defendant was physically coerced at the time he was picked up for questioning. While it is true that in the present case, defendant did not initiate the encounter with the investigating officers as was done by the defendant in *State v. Reynolds, supra*, he did elect to accompany the officers to the sheriff's department and chose to remain there, answering questions, without having been restrained in any way.

\* \* \* \*

Defendant contends that the trial court committed prejudicial error in admitting into evidence over his objection the opinion testimony of Dr. Page Hudson, Chief Medical Examiner of the State of North Carolina. The objection to Dr. Hudson's testimony rests upon four separate grounds: (1) The questions of the district attorney were not framed in such a way that they might form a proper basis for the expression of an opinion; (2) the testimony of Dr. Hudson was not responsive to the questions propounded to him; (3) the testimony of Dr. Hudson was based upon inadequate data; and (4) the testimony of Dr. Hudson invaded the province of the jury. The contention is without merit.

Dr. Hudson testified on behalf of the state as an expert witness qualified in the field of forensic pathology. He stated that unattached bones constituting a partial human skeleton had been brought to him; that the bones could have been those of more than one person; that there was no soft tissue on the bones when they were brought to his office; that the bones had been damaged

by physical contact with an object or animal of some kind; and that an examination of the bones revealed the presence of bird shot.

On direct examination, the following exchange transpired.

Q. What did your examination of the skeletal remains themselves reveal, sir?

A. My examination revealed that there were—there was a major part of the tibia, which is the lower leg bone; a fibula, or two thigh bones; approximately half a dozen hand or foot bones; there were fourteen vertebrae; backbone; there was part of the sacrum, which is the bone at the end of the spine; a portion of the hip bone; collar bone; several small fragments of bone, including some from the scapula, or shoulder bones; sixteen ribs; and a skull, including the lower jaw. After examination of these, with several specific things in mind, I was able to recognize that they were all compatible with being from a single human being, and in my opinion—were from one indiviudal, and in my opinion they were from a white male individual, whose age I evaluated as being somewhere between twenty and thirty, and whose height was approximately six feet tall, give or take approximately two inches.

Q. Dr. Hudson, did you come to any conclusion, based on your examination of these remains, as to what caused the death of that individual?

A. Yes, sir. On the basis of my examination of the material . . ., I did form an opinion as to the cause of death.

Q. And on what did you base—specifically, on what did you base this opinion?

A. On the presence of pellets imbedded in the shoulder bone and the scapula, and the presence of other pellets in this material, it was my opinion that the person probably died of a shotgun wound, shotgun blast.

[3] (1) The questions of the district attorney were not framed in such a way that they might form a proper basis for the expression of an opinion.

Defendant argues that the questions of the district attorney were inadequately phrased in that they were not in the form of a hypothetical and that they called for the witness to testify as to whether a particular event or condition did produce the result in question, i.e. the death of Bobby Smith. We disagree.

It is settled law in North Carolina that an expert witness need not be interrogated by means of a hypotheical question which incorporates the relevant facts in evidence which counsel hopes the jury will accept as true when the facts upon which he bases his opinion are within his personal knowledge. *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978); *State v. Griffin*, 288 N.C. 437, 219 S.E. 2d 48 (1975), *death sentence vacated*, 49 L.Ed. 2d 1210 (1976); *Huff v. Thornton*, 287 N.C. 1, 213 S.E. 2d 198 (1975); *see also* 1 Stansbury's North Carolina Evidence § 136 (Brandis rev. 1973). The evidence showed that Dr. Hudson had examined the remains himself. It naturally follows that he was competent to state an opinion concerning those remains without the intervention of a hypothetical question.

When the subject of a jury's inquiry relates to cause and effect in a field where special knowledge is required to answer a question put to an expert witness, the purpose behind allowing expert testimony is likely to be thwarted or perverted unless the expert witness is allowed to express a positive opinion (if he has one) on the subject. *Taylor v. Boger*, 289 N.C. 560, 223 S.E. 2d 350 (1976); *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), *death sentence vacated*, 49 L.Ed. 2d 1212 (1976). As an expert in the field of forensic pathology, Dr. Hudson was qualified to state an opinion as to what probably caused the death of Bobby Smith without couching his testimony in terms of what might have or could have caused his death.

(2) The testimony of Dr. Hudson was not responsive to the questions propounded to him.

Defendant contends that even though the district attorney did not ask Dr. Hudson a question which called for the expression of an opinion in its answer, on two occasions he nevertheless offered his opinion. When asked by the district attorney what his examination of the skeletal remains revealed, Dr. Hudson answered that it was his opinion that the remains were those of a white male who was between twenty and thirty years old and

who was approximately six feet tall. Shortly thereafter, Dr. Hudson testified that it was his opinion that the individual whose remains he had examined had probably died from a shotgun blast. This statement was in addition to his answer to a question as to what was the basis for his opinion as to the cause of death, *i.e.*, "the presence of pellets imbedded in the shoulder bone and the scapula, and the presence of other pellets in this material." Defendant's objections were overruled, and his motions to strike were denied. The court did not commit error in this regard.

"Whether an answer is responsive to a question is not the ultimate test on a motion to strike. If an unresponsive question produces irrelevant facts, they may and should be stricken and withdrawn from the jury. However, if the answers bring forth relevant facts, they are nonetheless admissible [although] they are not specifically asked for or go beyond the scope of the question." *State v. Ferguson*, 280 N.C. 95, 98, 185 S.E. 2d 119 (1971). In other words, if an answer states relevant and otherwise admissible evidence, it need not be stricken merely because it was not responsive to the question. *In re Will of Taylor*, 260 N.C. 232, 132 S.E. 2d 488 (1963); *In re Will of Tatum*, 233 N.C. 723, 65 S.E. 2d 351 (1951). The identification of the remains as well as the cause of death were relevant subjects of inquiry in the trial. That evidence pertaining to these two matters was not sought in the questions which nonetheless elicited these responses is immaterial.

(3) The testimony of Dr. Hudson was based upon inadequate data.

Defendant argues that the opinion testimony of Dr. Hudson was based upon inadequate data in that the only facts which were then in evidence were that human bones had been examined by him and that bird shot had been found among them. There was a sufficient foundation laid for Dr. Hudson's testimony. Prior to stating any opinion, Dr. Hudson testified that he had examined the remains collectively and indiviudally, measuring, sorting and photographing them.

(4) The testimony of Dr. Hudson invaded the province of the jury.

Defendant argues that the testimony of Dr. Hudson invaded the province of the jury by containing an opinion as to what was

the cause of death of the individual who was later identified as Bobby Smith. This argument has no merit.

It has long been the rule in North Carolina that the cause of an individual's death is the proper subject of expert testimony. *State v. Hairston,* 280 N.C. 220, 185 S.E. 2d 633 (1972); *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541 (1970); *State v. Cole,* 270 N.C. 382, 154 S.E. 2d 506 (1967); *see generally* 1 Stansbury's North Carolina Evidence § 135 (Brandis Rev. 1973). There was no dispute as to the qualifications of Dr. Hudson. He had sufficient information upon which to base an opinion as to the cause of Bobby Smith's death. *See generally* Comment, Expert Medical Testimony: Differences Between the North Carolina Rules and the Federal Rules of Evidence, 12 Wake Forest L. Rev. 833 (1976).

\*     \*     \*     \*

[4] Defendant contends that the district attorney exceeded the bounds of propriety in his argument to the jury and thereby deprived him of his right to a fair and impartial trial. Our examination of the record indicates that at the time of the district attorney's argument, no objection of any kind was made to any portion of the jury argument. While it is true that counsel have wide lattitude in making their arguments to the jury, *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979); *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975), counsel may not travel outside of the record and inject into his argument facts within his own knowledge, *Jenkins v. Harvey C. Hines Co.,* 264 N.C. 83, 141 S.E. 2d 1 (1965), or facts outside of the evidence. *Cuthrell v. Greene,* 229 N.C. 475, 50 S.E. 2d 525 (1948). When counsel makes an improper remark in his argument to the jury, an exception must be taken before verdict or the alleged impropriety is waived. *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970), *death sentence vacated,* 29 L.Ed. 2d 860 (1971). However, a trial judge has the duty to act *ex mero motu* in those instances where such action is necessary to preserve in an unencumbered state the right of a defendant to a fair and impartial trial. *See Lamborn & Co. v. Hollingsworth,* 195 N.C. 350, 142 S.E. 19 (1928); *McLaurin v. Williams,* 175 N.C. 291, 95 S.E. 559 (1918); *Massey v. Alston,* 173 N.C. 215, 91 S.E. 964 (1917). In light of the serious penalty which has been imposed upon defendant, *see State v. Williams, supra,* we have carefully reviewed the argument of the district attorney even

though no objection was made at the time of the argument. We find no support in the record for any of defendant's exceptions to the argument and particularly for his contentions that the district attorney characterized him as a liar, commented on his failure to testify on his own behalf, or expressed an opinion as to his guilt.

\*     \*     \*     \*

[5]     Defendant contends that the trial court erred in denying his motion to dismiss at the close of the state's evidence and his motion to dismiss at the close of all the evidence. Defendant argues that the state, by introducing his confession in which he claimed the killing of Bobby Smith was an accident, is bound entirely by the purported truth of that statement. We disagree.

When the state introduces into evidence exculpatory statments of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the state is bound by those statements. *State v. Bruton*, 264 N.C. 488, 142 S.E. 2d 169 (1965); *State v. Gaines*, 260 N.C. 228, 132 S.E. 2d 485 (1963). However, the introduction by the state of a defendant's exculpatory statement does not preclude the state from showing the facts concerning the crime to be different, and does not require the granting of a motion to dismiss if the state contradicts or rebuts the defendant's exculpatory statement. *State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 54 L.Ed. 2d 288 (1977); *State v. Carter*, 289 N.C. 35, 220 S.E. 2d 313 (1975), *death sentence vacated*, 49 L.Ed. 2d 1211 (1976); *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds sub nom.*, 53 L.Ed. 306 (1977). On a motion to dismiss, all of the admitted evidence must be viewed in the light most favorable to the state, and the state must be given the benefit of every reasonable inference to be drawn therefrom. *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977); *State v. May, supra; State v. Poole*, 285 N.C. 108, 203 S.E. 2d 786 (1974).

We hold that dismissal was properly denied in view of evidence which casts doubt on defendant's statement that the killing was accidental. This evidence is to the effect that: (1) defendant had made up his mind to rob Bobby Smith and went to the produce stand for that purpose, although he kept changing his mind from time to time throughout the course of his activities on whether to go through with his intention; (2) defendant lied to

Bobby about the condition of his father and thereby induced him to close the produce stand; (3) defendant did not take Bobby home, but instead took him to a remote area of Scotland County where he induced Bobby to get out of the car by lying to him about the presence nearby of some marijuana plants; (4) defendant walked into the woods carrying a shotgun, falsely saying that it was for the purpose of killing rabbits; (5) defendant did not assist or aid Bobby in any manner after he was shot but, instead, ran away frightened from the area.

Taken together, the foregoing inconsistences in defendant's statement are sufficient to present a jury question as to whether the killing was accidental or intentional. Therefore, the state is not bound by the exculpatory portions of defendant's statement and is entitled to go to the jury on the issue of defendant's guilt of the crime charged. *See State v. Hankerson, supra.*

\*　　\*　　\*　　\*

[6] Defendant argues that the trial court committed prejudicial error in its charge with respect to death by accident. The charge excepted to by defendant contained the following language.

"The defendant contends that Bobby Smith's death was accidental. If the killing was in fact accidental, the defendant would not be guilty of any crime, even though his acts were responsible for the victim's death. A killing is accidental if it is unintentional, occurs during the course of lawful conduct, and does not involve criminal negligence. A killing cannot be intentional or criminally negligent if it was the result of an accident. When the defendant asserts that the victim's death was the result of an accident, he is in effect denying the existence of those facts which the State must prove beyond a reasonable doubt in order to convict him. Therefore, the burden is on the State to prove those essential facts, and in so doing, disprove the defendant's assertion of accidental death. The State must satisfy you beyond a reasonable doubt that the victim's death was not accidental before you may return a verdict of guilty.

"Now, Members of the Jury, bearing in mind that the burden of proof rests upon the State to establish the guilt of the defendant beyond reasonable doubt, I charge that if you find

*State v. Morgan*

from this evidence that the killing of the deceased was accidental—that is, that Bobby Smith's death was brought about by an unknown cause or that it was from an unusual or unexpected event, from a known cause, and you also find that the killing of the deceased was unintentional, that at the time of the homicide the defendant was engaged in the performance of a lawful act, without any intention to do harm, and that at the time he was using proper precaution to avoid danger; if you find these to be the facts, remembering that the burden is upon the State, then I charge you that the killing of the deceased was a homicide by misadventure and if you so find, it would be your duty to render a verdict of not guilty as to this defendant."

Defendant contends that the instruction set out above is confusing in that it would permit the jury to conclude that it must find beyond a reasonable doubt from the evidence that the killing of Bobby Smith was accidental in order to acquit defendant. We disagree.

The first portion of the charge clearly and properly placed the burden on the state to prove each and every element of the crime charged beyond a reasonable doubt, thereby disproving defendant's assertion of an accidental death. *State v. Patterson*, 297 N.C. 247, 254 S.E. 2d 604 (1979); *State v. Jones*, 287 N.C. 84, 214 S.E. 2d 24 (1975). The second portion of the charge which is set out above is identical to that which we approved in *State v. Harris*, 289 N.C. 275, 221 S.E. 2d 343 (1975). We are not disposed to reexamine our holding in *Harris*.

\*      \*      \*      \*

We have carefully considered the other assignments of error brought forward in defendant's brief and find no merit in any of them. Our deliberations impel the conclusion that defendant received a fair and impartial trial which was free from prejudicial error.

No error.